# EXHIBIT A



**CT Corporation**
**Service of Process Notification**
07/12/2022
CT Log Number 541901283

## Service of Process Transmittal Summary

**TO:**     Ca Legalit
Bank of America
31303 AGOURA ROAD, CA6-917-02-18
WESTLAKE VILLAGE, CA 91361-4635

**RE:**     **Process Served in Florida**

**FOR:**    Bank of America, National Association  (Domestic State: N/A)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | RUSTY115 CORP.; HOPOP CORP.; DAVIDPOP CORP.; RUSTYPOP CORP.; DARUSTY CORP.; MONCLER MOTORS, LLC; BOE 25014, LLC; BOE 30868, LLC; BOE 30874, LLC; BOE 30875, LLC; BOE 34432, LLC; DASH 30875, LLC; BOE 34432, LLC; DASH 4542 LLC; DASH 4554 LLC; DASH 4555 LLC; CMG 777 ESCROW3, LLC; CMG 777 ESCROW4, LLC; CMG 777 ESCROWS, LLC; CMG DHC8ESCROW7, LLC; BAYSIDE SUPPORT SERVICES, LLC; CCUR HOLDINGS, INC.; CCUR AVIATION FINANCE LLC; AND EDIDIN PARTNERS LLC, vs. BANK OF AMERICA, N.A. Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Miami-Dade County Circuit Court, FL<br>Case # 2022012171CA01 |
| **NATURE OF ACTION:** | Letter material representations of existing facts that were false (fraud) |
| **PROCESS SERVED ON:** | C T Corporation System, Plantation, FL |
| **DATE/METHOD OF SERVICE:** | By Process Server on 07/12/2022 at 03:04 |
| **JURISDICTION SERVED:** | Florida |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S)/SENDER(S):** | Stuart H. Singer<br>Boies Schiller Flexner LLP<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, FL 33301<br>954-356-0011 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/12/2022, Expected Purge Date: 07/17/2022<br><br>Image SOP<br><br>Email Notification,  Ca Legalit  calegalit@bofa.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>1200 South Pine Island Road<br>Plantation, FL 33324<br>877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

 **Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
07/12/2022
CT Log Number 541901283

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

 Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:**                         Tue, Jul 12, 2022
**Server Name:**           CHRISTOPHER YEOMAN

| Entity Served | BANKOFAMERICA, NATIONALASSOCIATION |
| --- | --- |
| Case Number | 2022-012171-CA-01 |
| Jurisdiction | FL |

| Inserts | | |
| --- | --- | --- |
| | | |



Filing # 152699182 E-Filed 07/05/2022 02:42:52 PM

| ☒IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. ☐IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| **DIVISION** ☒ CIVIL ☐ DISTRICTS ☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE** **(a) GENERAL FORMS** | **CASE NUMBER** 2022-012171-CA-01 |
| **PLAINTIFF(S)** Rusty115 Corp. et al. | **VS.  DEFENDANT(S)** Bank of America, N.A.   DATE _7/12/22_ TIME _2:20pm_ Served by C.Y. sps#262 | **SERVICE** |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on

defendant(s): Bank of America, N.A. via Registered Agent: C T Corporation System
1200 South Pine Island Road, Plantation, FL 33324

_____

_____

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Stuart H. Singer, Boies Schiller Flexner LLP

_____

whose address is: 401 East Las Olas Boulevard, Suite 1200, Fort Lauderdale, FL 33301

_____

_____

CLOCK IN

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days.**" after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN CLERK of COURTS** | 217043 _Jaron Bethel_ DEPUTY CLERK | | **DATE** 7/8/2022 |
|---|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 152628858 E-Filed 07/01/2022 05:09:14 PM

**IN THE CIRCUIT COURT OF 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA**

| | |
|---|---|
| RUSTY115 CORP.; HOPOP CORP.; DAVIDPOP CORP.; RUSTYPOP CORP.; DARUSTY CORP.; MONCLER MOTORS, LLC; BOE 25014, LLC; BOE 30868, LLC; BOE 30874, LLC; BOE 30875, LLC; BOE 34432, LLC; DASH 4542 LLC; DASH 4554 LLC; DASH 4555 LLC; CMG 777 ESCROW3, LLC; CMG 777 ESCROW4, LLC; CMG 777 ESCROW5, LLC; CMG DHC8ESCROW7, LLC; BAYSIDE SUPPORT SERVICES, LLC; CCUR HOLDINGS, INC.; CCUR AVIATION FINANCE LLC; AND EDIDIN PARTNERS LLC, | Case No. _____  COMPLEX BUSINESS LITIGATION  **JURY TRIAL DEMANDED** |

Plaintiffs,

v.

BANK OF AMERICA, N.A.,

Defendant.

## **COMPLAINT**

Plaintiffs Rusty115 Corp., Hopop Corp., DavidPop Corp., RustyPop Corp., and DaRusty

Corp. (collectively, "Rusty"); Moncler Motors, LLC, BOE 25014, LLC; BOE 30868, LLC; BOE

30874, LLC; BOE 30875, LLC; BOE 34432, LLC; Dash 4542 LLC; Dash 4554 LLC; and Dash

4555 LLC (collectively "Moncler"); CMG 777Escrow3, LLC; CMG 777 Escrow4 LLC; CMG

777Escrow5, LLC; and CMG DHC8Escrow7, LLC (collectively, "CMG "); Bayside Support

Services, LLC ("Bayside"); CCUR Holdings Inc. and CCUR Aviation Finance LLC (collectively,

"CCUR"); and Edidin Partners, LLC ("Edidin") (all of the foregoing, collectively "Plaintiffs") sue

defendant Bank of America, N.A. ("BofA") and allege as follows:

1

## INTRODUCTION

1.      Plaintiffs are victims of a Ponzi scheme involving fraudulent aircraft sale transactions that was enabled by BofA's misrepresentations and omissions to Plaintiffs and BofA's failure to abide by its obligations with respect to the trust account (the "Trust Account") in which Plaintiffs deposited more than $167 million – all of which Plaintiffs have lost as a result of the Ponzi scheme. Knowing that Plaintiffs would rely upon them to make deposits into the Trust Account, BofA issued letters (the "Letters") that knowingly or negligently falsely represented the financial trustworthiness and condition of its customer, Wright Brothers Aviation Title ("Wright Brothers"), one of the fraudsters at the center of the Ponzi scheme, which BofA told Plaintiffs was a "well respected aviation title company." The Letters also knowingly both misrepresented and omitted disclosing material information concerning the amounts and activity in the Trust Account.

2.      Without these representations and omissions by BofA and the comfort of BofA's vouching for Wright Brothers, Plaintiffs never would have entered into the transactions with Wright Brothers and, consequently, never would have transferred millions of dollars into the BofA Trust Account. BofA knew and intended its false and misleading Letters would be used by Wright Brothers to lure third parties like Plaintiffs to participate in the Ponzi scheme. Indeed, BofA knew that the very fact of a highly-respected national bank vouching for Wright Brothers was intended to – and did – cloak with legitimacy both Wright Brothers and the transactions in which Plaintiffs participated.

3.      In its Letters, in addition to general assurances about Wright Brothers' excellent standing with BofA, the quality of services Wright Brothers provided to its clients, and its touting of Wright Brothers as a "well respected aviation title company," BofA provided specific information about Wright Brothers and its accounts, including the dollar amount of aircraft-related transactions that passed through Wright Brothers' Trust Account. But the Letters that BofA created

2

included materially false and misleading information, including gross overstatements of the account balances Wright Brothers maintained at BofA, and material omissions, including with respect to the activity of the Trust Account, which BofA knew was inconsistent with an account in which escrow funds relating to aviation transactions were deposited.

4.     The Letters did, however, achieve their intended purpose: to get Plaintiffs to pour millions of dollars into Wright Brothers' Ponzi scheme. On February 24, 2021, Plaintiffs first learned of the enormous scope of the fraud when the U.S. Attorney's Office for the Eastern District of Texas unsealed a third superseding indictment charging Debra Mercer-Erwin ("Mercer-Erwin") and Kayleigh Moffett ("Moffett"), the mother and daughter who were Wright Brothers' owner and officer, respectively, with criminal violations including fraud, money laundering, and narcotics trafficking.[1] It was then that Plaintiffs realized that Wright Brothers, the customer lauded by BofA as a "well respected aviation title company," had stolen their money.

### PARTIES, JURISDICTION, AND VENUE

5.     Plaintiffs Rusty115 Corp., Hopop Corp., DavidPop Corp., RustyPop Corp., and DaRusty Corp. are corporations incorporated in Florida with their principal places of businesses at 711 N. Ocean Boulevard, Delray Beach, FL 33483.

6.     Plaintiffs Moncler Motors, LLC; BOE 25014, LLC; BOE 30868, LLC; BOE 30874, LLC; BOE 30875, LLC; BOE 34432, LLC; Dash 4542 LLC; Dash 4554 LLC; and Dash 4555 LLC are limited liability companies organized and existing under the laws of the state of Florida, with their principal place of business at 16690 Collins Avenue, Suite 1104, Sunny Isles Beach, FL 33160.

---

[1] The Department of Justice first indicted Mercer-Erwin and Moffett in sealed filing in August 2020.

7.      Plaintiffs CMG 777Escrow3, LLC; CMG 777Escrow4 LLC; CMG 777Escrow5, LLC; and CMG DHC8Escrow7, LLC are limited liability companies organized and existing under the laws of the State of Florida with their principal place of business at 4141 N.E. 2nd Avenue, Suite 204-A, Miami, FL 33137.

8.      Plaintiff Bayside Support Services, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 2 South Biscayne Blvd, Suite 2680, Miami, FL 33131.

9.      Plaintiff Edidin Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 3599 Hollywood Oaks Dr., Ft. Lauderdale, FL 33312.

10.     Plaintiffs CCUR Holdings, Inc. and CCUR Aviation Finance LLC are entities organized and existing under the laws of the State of Delaware with their principal places of business at 3800 N Lamar Blvd, Suite 200, Austin, TX 78756.

11.     Defendant BofA is a national association with its principal place of business at 100 North Tryon Street in Charlotte, North Carolina. BofA is subject to personal jurisdiction in Florida pursuant to Fla. Stat. § 48.193(1)(a)(1) because it operates, conducts, engages in, or carries on a business or business venture in this state and has offices and agencies in this state; and pursuant to Fla. Stat. § 48.193(1)(a)(6)(a) because it caused injury to persons within this state arising out of an act or omission by it outside of this state when, at or about the time of the injury, it engaged in solicitation or service activities within this state.

12.     This Court has subject matter jurisdiction over this action because this is an action for damages in excess of $137,000,000, exclusive of interest and costs, and is otherwise within the subject matter jurisdiction of this Court.

4

13.     Venue is proper in this Court pursuant to Fla. Stat. §§ 47.011 and 47.051 because a defendant resides in this county, the cause of action accrued in this county, and BofA has an office in this county for the transaction of its customary business.

## FACTUAL ALLEGATIONS

### I.     The Ponzi Scheme

14.     The Ponzi scheme perpetrated against the Plaintiffs was straightforward.   The Plaintiffs put up, to be held in escrow, substantial deposits for the future purchase of aircraft by others.  Plaintiffs were supposed to receive the return of the deposits they advanced once these sales transactions were either consummated or cancelled.   In exchange for putting up these deposits, Plaintiffs were paid interest or a fee.   To provide assurance to Plaintiffs that their escrowed deposits would be safeguarded, the deposits were to be held in the Trust Account with BofA.  When those operating the Ponzi scheme were indicted, Plaintiffs learned that their monies had not been held in escrow in the Trust Account, but had been paid out by BofA and used by the fraudsters for illicit purposes.

15.     To effectuate these transactions, Plaintiffs entered into escrow agreements with Wright Brothers, a third-party agent in the business of providing closing and escrow services in connection with the sale of aircraft (the "Escrow Agreements").  Mercer-Erwin was the owner and senior officer of Wright Brothers and her daughter, Moffett, was an officer of Wright Brothers. Those Escrow Agreements governed the deposit and return of the escrowed deposit funds.  Wright Brothers was designated as the third-party escrow agent by Federico Andres Machado, who operated the Ponzi scheme in concert with Wright Brothers, Mercer-Erwin, and Moffett.  The terms of Plaintiffs' Escrow Agreements specified that the escrowed funds would be deposited in the Trust Account maintained by BofA.  In view of the fact that Plaintiffs would deposit hundreds of millions

of dollars, the fact that a bank of BofA's reputation would maintain the Trust Account with the escrowed funds was of critical importance to Plaintiffs.

## II.    The Escrow Agreements and Trust Account Deposits

16.    Between November 2019 and November 2020, Plaintiffs and Wright Brothers entered into Escrow Agreements, each of which identifies the particular aircraft that is the subject of that Agreement by using the aircraft's unique Manufacturer Serial Number ("MSN").

17.    Rusty entered into the following Escrow Agreements:

   a.  May 18, 2020 DavidPop Escrow Agreement re MSN 38288.

   b.  May 18, 2020 HoPop Escrow Agreement re MSN 38290.

   c.  Nov. 12, 2020 Rusty115 Corp Escrow Agreement re MSN 36306.

   d.  Nov. 25, 2020 DaRusty Escrow Agreement re MSN 33377.

   e.  Nov. 25, 2020 RustyPop Escrow Agreement re MSN 34568.

18.    CMG entered into the following Escrow Agreements:

   a.  Nov. 12, 2019 CMG 777Escrow3 LLC Escrow Agreement re MSN 35159.

   b.  Nov. 14, 2019 CMG 777Escrow3 LLC re SN 35160.

   c.  Nov. 8, 2020 CMG 777Escrow4 LLC Escrow Agreement re MSN 40198.

   d.  Aug. 5, 2020 CMG 777Escrow5 LLC Escrow Agreement re MSN 40199.

   e.  Aug. 6, 2020 CMG 777Escrow5 LLC Escrow Agreement re MSN 40074.

   f.  Aug. 7, 2020 CMG 777Escrow5 LLC Escrow Agreement re MSN 40073.

   g.  Dec. 1, 2020 CMG DHC8Escrow7 LLC Escrow Agreement re MSN 4540.

   h.  Dec. 1, 2020 CMG DHC8Escrow7 LLC Escrow Agreement re MSN 4542.

19.    Moncler entered into the following Escrow Agreements:

   a.  Feb. 7, 2020 BOE 30875 LLC Escrow Agreement re MSN 30875.

   b.  Apr. 16, 2020 BOE 30874, LLC Escrow Agreement re MSN 30874.

6

   c.  Apr. 29, 2020 BOE 30868 LLC Escrow Agreement re MSN 30868.

   d.  May 18, 2020 BOE 34432, LLC Escrow Agreement re MSN 34432.

   e.  July 31, 2020 DASH 4542, LLC Escrow Agreement re MSN 4542.

   f.  July 31, 2020 DASH 4554, LLC Escrow Agreement re MSN 4554.

   g.  July 31, 2020 DASH 4555, LLC Escrow Agreement re MSN 4555.

   h.  Nov. 20, 2020, BOE 25014, LLC Escrow Agreement re MSN 25014.

20.    Bayside entered into the following Escrow Agreements:

   a.  July 6, 2020 Bayside Escrow Agreement re MSN 36305.

   b.  July 6, 2020 Bayside Escrow Agreement re MSN 36306.

   c.  Sept. 11, 2020 Bayside Escrow Agreement re MSN 36319.

   d.  Sept. 11, 2020 Bayside Escrow Agreement re MSN 36318.

21.    CCUR entered into the following Escrow Agreements:

   a.  May 14, 2020 CCUR Holdings, Inc. Agreement re MSN 34432.

   b.  May 14, 2020 CCUR Holdings, Inc. Agreement re MSN 35301.

   c.  Aug. 28, 2020 CCUR Aviation Finance, LLC Agreement re MSN 40342.

   d.  Aug. 28, 2020 CCUR Aviation Finance, LLC Agreement re MSN 40343.

22.    Edidin entered into the following Escrow Agreements:

   a.  May 14, 2020 Edidin Agreement re MSN 34432.

   b.  May 14, 2020 Edidin Agreement re MSN 35301.

   c.  Aug. 27, 2020 Edidin Agreement re MSN 40342.

   d.  Aug. 27, 2020 Edidin Agreement re MSN 40343.

23.    Under the terms of each Escrow Agreement, Wright Brothers was defined as the "Escrow Agent" and the respective Plaintiff was defined as the "Depositor." In the Escrow

Agreements, Wright Brothers agreed "to hold, invest, and disburse all funds received from or on behalf of the Depositor" in accordance with the terms of the agreement.  Wright Brothers also agreed to, "under no circumstances . . . disburse the Escrow Funds or any portion thereof to any party other than the Depositor," as is customary in aircraft transactions.

24.     The Escrow Agreements also provided that Plaintiffs would wire a specified amount, ranging from $250 thousand to $15 million (the "Escrow Funds") to the Trust Account.

25.     Pursuant to its Escrow Agreements, Rusty made deposits in the aggregate amount of $25,000,000 into the Trust Account, as follows:

| | | | | | |
|---|---|---|---|---|---|
| a. | 5/18/20 | DavidPop | 38288 | SU-GDN | $5,000,000. |
| b. | 5/18/20 | HoPop | 38290 | SU-GDP | $5,000,000. |
| c. | 11/12/20 | Rusty115 | 36306 | VT-ALG | $5,000,000. |
| d. | 11/25/20 | DaRusty | 33377 | 9V-SWB | $5,000,000. |
| e. | 11/25/20 | RustyPop | 34568 | 9V-SWA | $5,000,000. |

26.     Pursuant to its Escrow Agreements, CMG made deposits in the aggregate amount of $75,000,000 into the Trust Account, as follows:

| | | | | | |
|---|---|---|---|---|---|
| a. | 11/12/19 | CMG 777 ESCROW3 LLC | 35159 | VT-JES | $15,000,000. |
| b. | 11/14/19 | CMG 777 ESCROW3 LLC | 35160 | VT-JEU | $15,000,000. |
| c. | 7/8/20 | CMG 777 ESCROW4 LLC | 40198 | HL-825 | $10,000,000. |
| d. | 8/5/20 | CMG 777 ESCROW5 LLC | 40073 | PK-GIK | $10,000,000. |
| e. | 8/7/20 | CMG 777 ESCROW5 LLC | 40074 | PK-GIA | $10,000,000. |
| f. | 8/5/20 | CMG 777 ESCROW5 LLC | 40199 | HL8284 | $10,000,000. |
| g. | 9/1/20 | CMG DHC8 ESCROW7 LLC | 4540 | ET-AU | $2,500,000. |
| h. | 9/1/20 | CMG DHC8 ESCROW7 LLC | 4542 | ET-AU | $2,500,000. |

27.     Pursuant to its Escrow Agreements, Moncler made deposits in the aggregate amount of $32,875,000 into the Trust Account, as follows:

a.  2/6/20       BOE 30875, LLC       30875  9V-SQJ       $4,000,000.

b.  4/16/20      BOE 30874, LLC       30874  9V-SVM       $4,150,000.

c.  4/29/20      BOE 30868, LLC       30868  9V-SYF       $3,950,000.

d.  5/18/20      BOE 34432, LLC       34432  B-KPC        $4,050,000.

e.  7/31/20      Dash 4555 LLC        4555   5Y-JXB       $4,575,000.

f.  7/31/20      Dash 4542 LLC        4542   ET-AUE       $4,575,000.

g.  7/31/20      Dash 4554 LLC        4554   5Y-JXE       $4,575,000.

h.  11/20/20     BOE 25014, LLC       25014  N755CS       $3,000,000.

28.     Pursuant to its Escrow Agreements, Bayside made deposits in the aggregate amount of $19,000,000 into the Trust Account, as follows:

a.  7/6/2020     Bayside Support Services, LLC   36305     VT-ALF $4,750,000.

b.  7/6/2020     Bayside Support Services, LLC   36306     VT-ALG $4,750,000.

c.  9/11/2020    Bayside Support Services, LLC   36319     VT-ALU $4,750,000.

d.  9/11/2020    Bayside Support Services, LLC   36318     T-ALT $4,750,000.

29.     Pursuant to its Escrow Agreements, CCUR made deposits in the aggregate amount of $14,000,000 into the Trust Account, as follows:

a.  5/14/2020    CCUR Holdings, Inc.              34432     K-BPC   $2,500,000.

b.  11/13/2020   CCUR Aviation Finance, LLC       34432     K-BPC   $1,750,000.

c.  5/14/2020    CCUR Holdings, Inc.              35301     K-BPH   $2,500,000.

d.  11/13/2020   CCUR Aviation Finance, LLC       35301     K-BPH   $1,750,000.

e.  8/28/2020    CCUR Aviation Finance, LLC       40342     4K-AI01 $2,500,000.

| | | | | | |
|---|---|---|---|---|---|
| f. | 11/27/2020 | CCUR Aviation Finance, LLC | 40342 | 4K-AI01 | $250,000. |
| g. | 8/28/2020 | CCUR Aviation Finance, LLC | 40343 | 4K-AZ81 | $2,500,000. |
| h. | 11/27/2020 | CCUR Aviation Finance, LLC | 40343 | 4K-AZ81 | $250,000. |

30.     Pursuant to its Escrow Agreements, Edidin made deposits in the aggregate amount of $2,000,000 into the Trust Account, as follows:

| | | | | | |
|---|---|---|---|---|---|
| a. | 5/14/2020 | Edidin Partners LLC | 34432 | K-BPC | $750,000. |
| b. | 5/14/2020 | Edidin Partners LLC | 35301 | K-BPH | $750,000. |
| c. | 8/27/2020 | Edidin Partners LLC | 40342 | 4K-AI01 | $250,000. |
| d. | 8/27/2020 | Edidin Partners LLC | 40343 | 4K-AZ81 | $250,000. |

31.     Pursuant to the Escrow Agreements, Plaintiffs collectively deposited in excess of $167 million to the Trust Account with respect to these transactions.

## III.  The Indictment

32.     On February 24, 2021, in *United States v. Debra Lynn Mercer-Erwin, et al.*, Case No. 4:20-CR-212, in the Eastern District of Texas, the government unsealed a Third Superseding Indictment charging Mercer-Erwin and Moffett (and others, including Machado) with money laundering, wire fraud, aircraft registration violations, and conspiracy to distribute narcotics.  On May 5, 2021, the government filed a Fifth Superseding Indictment (the "Indictment") alleging that beginning on an as-yet undetermined date, but no later than 2016, Wright Brothers, through its principals and agents, Mercer-Erwin and Moffett, conspired with Machado and others (together, the "Ponzi Perpetrators" or "Perpetrators") to devise and perpetrate a Ponzi scheme in connection with the putative purchase of commercial aircraft.  The government arrested Mercer-Erwin and Moffett and, around December 2020, seized the remaining funds held in the Trust Account maintained by BofA.  As of the date of this filing, Machado is outside of the United States and is the subject of extradition proceedings brought by the U.S. Department of Justice.

33.     As detailed in the Indictment, the Perpetrators used fraudulent or fictitious buyers, including South Aviation, Inc. ("South Aviation"), Machado's company, to induce individuals and entities – including Plaintiffs – to invest in the Ponzi scheme by depositing money in the Trust Account maintained by BofA.

34.     After Plaintiffs' funds were deposited into the Trust Account, they were not kept in the Trust Account as required by the Escrow Agreements, but instead were illicitly diverted from the Trust Account to Machado or Machado-designated entities. In some instances, the monies were transferred out of the Trust Account on the same day they were deposited, contrary to the nature and purpose of an escrow account in the aviation sales business.

35.     As detailed in the Indictment, the Ponzi scheme consisted of the following four steps:

a.     Pursuant to the Escrow Agreements, in exchange for receipt of interest or a fee, a Plaintiff agreed to provide the fraudulent buyer (*e.g.,* South Aviation) with a refundable deposit, which the fraudulent buyer purported would be used as security for the purchase of the aircraft.

b.     The fraudulent buyer designated the Trust Account maintained at BofA to hold in escrow the Plaintiff's money.

c.     The Escrow Agreements required that the Plaintiff's money be fully refunded from the Trust Account unless the putative buyer successfully completed an inspection of the aircraft by a date certain. Notwithstanding that an inspection did not take place due to the fraudulent nature of the scheme, the Perpetrators did not refund the Plaintiff's deposit, instead illicitly transferring it to other accounts. In addition to the funds the Perpetrators diverted to others,

they also used funds from the Trust Account in order to "compensate" themselves for the fraudulent transactions.

d.      To perpetuate the Ponzi scheme, another deposit would be secured from another victim for the purported purchase of a different aircraft.  This deposit was then used to pay the principal and interest owed to another victim of a previous fraudulent transaction.  This Ponzi cycle continued until the unsealing of the indictment, at which point Plaintiffs became aware that they had suffered their losses.

36.     Upon information and belief, Wright Brothers allowed South Aviation and Machado access to Plaintiffs' funds that were deposited in the Trust Account.  Mercer-Erwin, Moffett, and other Perpetrators with access to the Trust Account, then transferred funds, including Plaintiffs' funds, from the Trust Account to other accounts for their own illicit, personal use.

**IV.     BofA's Relationship with Wright Brothers**

37.     Since at least August 2, 2002, BofA has maintained Wright Brothers as a banking customer.  On that date, Mercer-Erwin, as President and Secretary of Wright Brothers, executed corporate signature cards for two Wright Brothers business bank accounts: (1) the Operating Account ("Wright Brothers Aircraft Title, Inc. Operating Account," ending in *9081) and (2) the Trust Account ("Wright Brothers Aircraft Title, Inc. Trust Account," ending in *9094).  The signature card provided by BofA and all the bank statements from the Trust Account clearly identify it as a "trust account."  Since Wright Brothers and BofA established the Operating Account and the Trust Account, BofA has earned fees from maintaining those accounts.

38.     In contrast to a typical "demand deposit account," where funds can be withdrawn at will by the account holder for whatever purpose, the Trust Account that BofA maintained for Wright Brothers was designed and intended to provide a safe and reliable method of securing deposited escrow funds.  The Trust Account was designed to hold in escrow funds on behalf of

Plaintiffs until the inspection of the aircraft and other steps related to the aircraft purchase transaction were completed. Wright Brothers, as the escrow agent, owed Plaintiffs a fiduciary duty to keep the escrowed funds secure until the fulfillment of certain conditions of the transactions. Following satisfaction of the conditions, the escrow agent had a fiduciary duty to dispense the escrowed funds, and then only as permitted by the escrow agreement.

39.     BofA was fully aware of the nature of the relationship between Wright Brothers and Plaintiffs. BofA has experience in aviation transactions, including with respect to escrowed deposit funds and the limitations placed upon use of those funds. It touted Wright Brothers not just as a good customer, but as a "respected aviation title company." In fact, BofA has been involved as a seller (either directly or through agents) in such transactions where Wright Brothers has been the escrow agent. BofA knew that the deposits into the Trust Account were supposed to be held in escrow in connection with an aviation transaction and knew that, as such, the funds in the accounts were to be treated in the manner typical of escrowed deposits in aviation transactions.

## V.     BofA's Responsibilities and Obligations

40.     In addition to its knowledge of Wright Brother's business and about the nature of the escrowed funds deposited in the Trust Account, as a federally insured national association, BofA must comply, *inter alia*, with the provisions of the Bank Secrecy Act (31 U.S.C. §5311 *et seq.*) ("BSA"), which was enacted to prevent financial institutions from being used to hide and disguise money used in furtherance of criminal enterprises or other unlawful activities. In addition to protecting the overall economy from the corrosive impacts of money laundering, BSA reporting can help protect individuals from fraud and theft of their assets.[2]

---

[2] *See, e.g.*, https://www.fincen.gov/news/news-releases/fincen-analysis-bank-secrecy-act-reports-filed-financial-institutions-help.

41.　　The BSA establishes the standard for protective policies and procedures that govern all banking transactions. To comply with the requirements of the BSA, BofA is required to establish internal policies, procedures, and controls that are custom-tailored to the specific and unique aspects of BofA's operations, including designation of specific officers to review compliance, employee training, independent testing, and customer due diligence. BofA also must implement programs that adequately prevent, detect, and report suspicious activity, as defined by the BSA and other pertinent statutes. These programs must reflect BofA's specific risks and requirements.

42.　　BofA also must institute ongoing internal monitoring and review, as well as independent monitoring and audits, to ensure compliance with its obligations. Further, BofA must perform specific, risk-based due diligence focused on identified concerns or threats for suspicious transactions. As part of this due diligence, BofA must ensure strict compliance with the BSA's "Know Your Customer" requirements, such as verifying the identity, suitability, and risks involved with maintaining a business relationship with all customers, including Wright Brothers, one of the Perpetrators of the fraud.

43.　　The "Know Your Customer" requirements are critical tools to improve BofA's view of its clients' identities and business relationships and to prevent BofA from participating in or facilitating illicit transactions, like the ones the Perpetrators ran through the Trust Account. The "Know Your Customer" obligations require that BofA must understand the nature of its customers' activities (including those of Wright Brothers) in order to ensure that the customer's funds are from a legitimate source. The "Know Your Customer" requirements provide only a baseline for performing customer due diligence, which BofA was required to supplement by its own assessment of the risk profile of the customer, including that of Wright Brothers.

14

44.     Enhanced Due Diligence ("EDD"), the collection of additional customer information, is mandated in connection with certain higher-risk customers or circumstances. In those circumstances, financial institutions, like BofA, are responsible for determining the risks and taking measures to ensure that customers, such as Wright Brothers, are not bad actors. This required that BofA consider the type of account, its size, and the pattern of activity, including types and frequency of transactions, among other factors, to assess account risk and to determine whether EDD is required.

45.     Trust accounts, including the one at issue here, are the type of account with respect to which EDD is appropriate. Periodic reviews by a financial institution of its trust accounts and the associated risks are also considered best practices. BofA has internal policies and procedures, designed to ensure compliance with the BSA in general, and the "Know Your Customer" requirements specifically, that require BofA to apply EDD to trust accounts, including the Trust Account.

46.     To comply with EDD requirements, it is standard industry practice for banks, like BofA, to have an automated account monitoring system that will examine transactions to identify the typical attributes of fraudulent transactions, including the common characteristics of transactions related to a Ponzi scheme. A standard automated account monitoring system sends an alert each and every time there is a deposit, withdrawal, or any transaction with suspicious attributes. Upon information and belief, BofA employs an automated account monitoring system to detect suspicious or potentially fraudulent transactions like the transactions typically seen in Ponzi schemes, and that system should have generated an alert for each and every deposit, withdrawal or any transaction with suspicious attributes.

**VI.    BofA Supplied the Perpetrators with False and Misleading Information That Enabled the Perpetrators to Commit Fraud**

47.    The cornerstone of the scheme to defraud Plaintiffs was the Perpetrators' ability to convince Plaintiffs to deposit funds in the Trust Account. In order to accomplish that goal, BofA provided the Letters with respect to Wright Brothers that were intended to assure Plaintiffs, and other victims, of the legitimacy and solvency of Wright Brothers and its operations.

48.    It is not uncommon for banks to issue comfort and balance verification letters, which are written undertakings designed to provide assurance to third-parties with respect to the bank's customer with whom the recipient is considering doing business. Where a bank provides a comfort or balance verification letter in connection with a transaction, the recipients of the letter foreseeably and reasonably rely on the assurances provided in the letter in deciding whether to proceed with the proposed transaction. That is the case with Plaintiffs.

49.    Because comfort and balance verification letters are critically significant to third parties who have knowledge of them, including Plaintiffs – and because of the potential risks and exposure to the bank associated with issuing such letters – a prudent bank maintains stringent policies and procedures in connection with drafting, reviewing, and issuing such letters in order to ensure that the information contained therein is accurate, complete, and truthful, as that information will be relied upon by third parties doing business with the bank's customer. Upon information and belief, BofA has internal policies and procedures that govern the content and provision of comfort and balance verification letters.

50.    From 2015 to 2020, BofA furnished Wright Brothers with multiple comfort and balance verification letters with the intent and knowledge that Wright Brothers and other Perpetrators would both provide those letters to potential victims of the Ponzi scheme and tout to victims the fact of its issuance of those letters, all to assure them that Wright Brothers could meet

its financial and contractual obligations in connection with the sales and purchases of aircraft and induce deposits into the Trust Account. The Letters announced themselves as "letter[s] of reference" regarding the "relationship between Wright Brothers [and BofA]" indicating that BofA understood and intended that the letters would be provided to – and relied upon by – potential victims of the Ponzi scheme, including Plaintiffs. By providing the Letters, BofA cloaked its "well respected" customer Wright Brothers in its reputation, enabling the Perpetrators to gain the confidence of Plaintiffs.

### A. The August 2015 Letter

51.    On August 20, 2015, BofA issued a Letter addressed "To Whom It May Concern" (the "August 2015 Letter"):

> I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.
>
> Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 14 years. All of their accounts are in excellent standing. Wright Brothers Aviation Title has authorized me to tell you that over $380MM dollars in aviation transactions have passed through their accounts in the past 6 months, annualizing at over $760MM. We have never received a complaint having to do with the services they provide to their clients.
>
> If you have any additional questions regarding our relationship with this respected aviation title company, you may reach out to me directly.

52.    The August 2015 Letter was signed by Brandon G. Ellis ("Ellis"), Vice President and Business Banking Client Manager at BofA's financial center located at 211 N. Robinson Ave, Oklahoma City, Oklahoma.

53.    The August 2015 Letter was received by Moncler.

### B. The December 2015 Letter

54.    On December 7, 2015, BofA issued a Letter addressed "To Whom It May Concern" (the "December 2015 Letter"):

> I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.
>
> Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 14 years. All of their accounts are in good standing. Wright Brothers Aviation Title has authorized me to tell you that over $320MM dollars in aviation transactions have passed through their accounts in the past 6 months, annualizing at over $640MM.
>
> If you have any additional questions regarding our relationship with this respected aviation title company, you may reach out to me directly.

55.     The December 2015 Letter was signed by Ellis and included his title, Vice President and Business Banking Client Manager, and identified his affiliation with BofA's financial center located at 211 N. Robinson Ave, Oklahoma City, Oklahoma.

56.     The December 2015 Letter was received by CMG.

### C.     The July 2016 Letter

57.     On July 5, 2016, BofA issued a Letter to Mercer-Erwin (the "July 2016 Letter"):

> Per your request, Wright Brothers Aircraft Title, Inc. has been a customer of Bank of America Merrill Lynch since October 18, 2001 and has maintained an aggregate average collected deposit balance of $11,818,006.50 over the past twelve months.

58.     The July 2016 Letter was signed by Mark Fish ("Fish"), Senior Vice President and Business Banking Relationship Manager for BofA.

### D.     The January 2017 Letter

59.     On January 11, 2017, BofA issued a Letter to Mercer-Erwin (the "January 2017 Letter"):

> Per your request, Wright Brothers Aircraft Title, Inc. has maintained an aggregate average collected deposit balance of $11,648,172.00 over the past twelve months.

60.     The January 2017 Letter was signed by Fish, Senior Vice President and Business Banking Relationship Manager.

### E.     The April 2017 Letter

61.     On April 27, 2017, BofA issued a Letter (the "April 2017 Letter") to Mercer-Erwin,

stating: "Per your request, the total amount of all deposits made into the Wright Brothers Aircraft

Title, Inc. Trust Account in calendar year 2016 was $405,612,916.62."

62.     The April 2017 Letter was signed by Fish, Senior Vice President and Business

Banking Relationship Manager.

63.     The April 2017 Letter was received by CMG.

### F.     The February 2018 Letter

64.     On February 26, 2018, BofA issued a Letter to Mercer-Erwin (the "February 2018

Letter"), stating:

> I am pleased to furnish a letter of reference regarding the relationship between
> Wright Brothers Aircraft Title, Inc. and Bank of America.
>
> Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship
> with Bank of America and its predecessors for the past 17 years. All of their
> accounts are in excellent standing. Wright Brothers Aviation Title has authorized
> me to tell you that their average volume over the last 6 months has been $183MM.
> We have never received a complaint having to do with the services they provide to
> their clients.
>
> If you have any additional questions regarding our relationship with this well
> respected aviation title company, you may reach out to me directly.

65.     The February 2018 Letter was signed by Elizabeth Haralson ("Haralson"), then a

Relationship Manager in the Business Banking Unit of BofA's Oklahoma City, Oklahoma office.

66.     The February 2018 Letter was received by CMG and Rusty.

### G.     The January 2019 Letter

67.     On January 24, 2019, BofA issued a Letter addressed "To Whom It May Concern"

(the "January 2019 Letter") stating:

> I am pleased to furnish a letter of reference regarding the relationship between
> Wright Brothers Aircraft Title, Inc. and Bank of America.

19

Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 18 years. All of their accounts are in excellent standing. Wright Brothers Aviation Title has authorized me to tell you that over $257 MM dollars in aviation transactions have passed through their account in the past 6 months, annualizing at over $515 MM. We have never received a complaint having to do with the services they provide to their clients.

If you have any additional questions regarding our relationship with this well respected aviation title company, you may reach out to me directly.

68.     The January 2019 Letter was signed by Haralson, then Vice President of Business Banking. The January 2019 letter included the address of BofA's financial center located at 211 N. Robinson Ave, Oklahoma City, Oklahoma in the footer.

69.     The January 2019 Letter was received by CMG.

### H.     The March 2019 Letter

70.     On March 1, 2019, BofA issued a Letter to Mercer-Erwin (the "March 2019 Letter"):

Per your request, Wright Brothers Aircraft Title, Inc. has been a Bank of America customer since 10/2001 and has maintained an aggregate average collected balance of $25,700,936.26 over the past six months.

71.     The March 2019 Letter was signed by Haralson, then Senior Vice President and Business Banking Relationship Manager for BofA.

### I.     The August 2019 Letter

72.     On August 9, 2019, BofA issued a Letter to Mercer-Erwin (the "August 2019 Letter"):

Per your request, Wright Brothers Aircraft Title, Inc. has been a Bank of America customer since 10/2001 and has maintained an average collected balance of $33,938,782.00 over the past six months.

73.     The August 2019 Letter was signed by Haralson, then Senior Vice President and Business Banking Relationship Manager for BofA.

74.     The Letters included general and specific representations about the legitimacy, stability, and creditworthiness of Wright Brothers, describing BofA's "strong banking relationship" with Wright Brothers, identifying Wright Brothers' status as "in excellent standing," stating that BofA "had never received a complaint having to do with the services [Wright Brothers] provide to their clients," and providing account information concerning aviation transactions. Also, each letter spoke to the legitimacy of Wright Brothers in the aviation industry by specifically referring to it as a "well respected aviation title company."

75.     The Letters were widely provided to potential depositors in the Trust Account for whom BofA knew the letters were intended. BofA knew that the Letters were being provided directly to potential depositors in the Trust Account, such as Plaintiffs, and additionally knew or should have known that the substance of the Letters, and the very fact that BofA had issued the Letters, was the subject of disclosures and representations to and among potential trust account depositors, such as Plaintiffs, who entered into escrow agreements with Wright Brothers and who relied on those facts to decide to make deposits into the Trust Account. Upon information and belief, BofA did not limit to whom the Letters would be given or disclosed and, on the contrary, knew or had reason to know that Mercer-Wright and Machado used the issuance and existence of the Letters to lure unsuspecting victims into the Ponzi scheme. In this way, the misrepresentations and misleading statements in the Letters were made directly or indirectly to each of the Plaintiffs, each of whom relied upon them.

76.     BofA knew or should have known that potential parties to escrow agreements with Wright Brothers who would deposit funds into the Trust Account but who may not have received the Letters directly from BofA were also made aware of the Letters and the information contained therein and relied upon the letters to make deposits in the Trust Account.

**VII.    The Information Provided in the Letters Was Materially False and Misleading**

77.    BofA's Letters were materially false, contained omissions that rendered them misleading, and misrepresented information about Wright Brothers' accounts, including account activity and balances.

78.    For example, in the February 2018 Letter, BofA stated that Wright Brothers' "average volume over the last 6 months has been $183MM." However, according to BofA's bank statements, Wright Brothers had a *total*, not an average, volume of $183 million in credits and deposits during that time period. The average amount in the account during that time period was in fact around $31.5 million, or only approximately one-fifth of the $183 million set forth in the letter.

79.    In the January 2019 Letter, BofA specified that "over $257 MM dollars in *aviation transactions* have passed through [Wright Brothers] account in the past 6 months" (emphasis added). However, records from BofA reveal that numerous large transactions among the bank's "$257 MM" claimed "aviation transactions," are, upon information and belief, unrelated to aviation transactions.

80.    In the March 2019 Letter, BofA stated that Wright Brothers "maintained an average collected balance of $25,700,936.26 over the past six months." However, according to BofA's bank statements, Wright Brothers' true average ledger balance during that six-month period was only $11,220,149.21. BofA's March 2019 Letter falsely stated an average collected balance that was *more than double* Wright Brothers' true and actual average collected balance for those six months. Specifically, BofA falsely overstated Wright Brothers' average collected balance by $14,480,787.05, a material misrepresentation.

81.    Again, in the August 2019 Letter, BofA falsely reported Wright Brothers' average collected balance over the prior six months. BofA stated that Wright Brothers "has maintained an

22

average collected balance of $33,938,782 over the past six months." In fact, according to BofA's bank statements, Wright Brothers' true average ledger balance during that six-month period was only $5,664,940. BofA's August 2019 Letter falsely overstated Wright Brothers' average ledger balance by more than $28 million, a material misrepresentation.

82. As the institution maintaining the Trust Account, BofA knew that this information in the Letters was false and inaccurate or misleading. The concerning the Trust Account was critical to Plaintiffs' decision to pay the deposits because it provided Plaintiffs with assurances and verification that the Trust Account was secure and contained more than sufficient funds to pay back their escrowed deposits, and further communicated that Wright Brothers was engaged in a legitimate aircraft financing operation.

## VIII.   BofA Ignored and Failed to Disclose Material Information About The Trust Account

83. In addition to taking proper steps to detect improper activity in the Trust Account, BofA identified or should have identified anomalies concerning the Trust Account because of the unusual timing and frequency of withdrawals from the account. In particular, BofA's knowledge about Wright Brothers' business and role as an escrow agent, along with the nature of the Trust Account and the deposits made to that account, meant that BofA knew or should have known that the account's activity was unusual and suspicious. Indeed, in some instances, the monies were transferred out of the Trust Account on the same day they were deposited, an event flatly inconsistent with the nature of the account. And often, the amounts were paid out in a manner also flatly at odds with the fact the monies paid into the accounts were deposits to be held in escrow pending the consummation of an aviation transaction.

84. BofA, a sophisticated national bank that routinely sets up, maintains, and monitors escrow and trust accounts, knew or should have known that the Perpetrators' withdrawals from the Trust Account were not consistent with the nature of escrowed deposit funds in the aviation

industry. Yet BofA failed to disclose such information concerning the activity of the Trust account and Plaintiffs were harmed by BofA's omission.

85.     Accordingly, either BofA intentionally ignored, was willfully blind to, recklessly ignored, or failed to exercise reasonable care with regard to activity in the Trust Account that it knew was irregular and suspicious activity and not consistent with the nature of the account, including through the use of suspicious activity alerts, in the course of its management of the Trust Account and, as a result, omitted material information in its representations about the Trust Account with respect to the activity in the account before, during, or after the provision of the Letters.

### IX.     In Reliance on BofA's False and Misleading Letters, Plaintiffs Deposited Funds Into the Trust Account and Were Thereby Defrauded

86.     BofA knew or had reason to know that the Letters and the information in them would be provided, directly or indirectly, to third parties in order to solicit business for Wright Brothers. Thus, BofA intended that the Letters and the information in them, in addition to the fact that BofA was vouching for Wright Brothers, would be communicated, directly or indirectly, to third parties such as Plaintiffs. In so doing, BofA intended that potential depositors, including Plaintiffs, would rely upon the letters themselves as BofA's stamp of approval to conduct business with Wright Brothers. Further, BofA necessarily intended that potential depositors, like Plaintiffs, would rely upon all the information contained within those letters when deciding to entrust their deposits to Wright Brothers' BofA accounts.

87.     Moreover, Moncler also had a 30 year professional relationship with BofA and enjoyed friendly and familiar professional relationships with several high-level officials within BofA's private banking organization. Because of this long-standing relationship, in or about 2016, and prior to deciding to conduct commercial aircraft transactions with Wright Brothers and

Mercer-Erwin, Moncler inquired with one particular high-level official in BofA's private banking organization as to BofA's relationship with Wright Brothers. A few days after the inquiry, the high-level official responded that Wright Brothers and Mercer-Erwin were longtime clients in good-standing, that they maintained substantial deposits at BofA's bank, and that Wright Brothers and Mercer-Erwin enjoyed an excellent reputation at BofA's bank. Following these assurances, Moncler agreed to conduct commercial aircraft transactions with Wright Brothers which entailed deposing substantial sums in the Trust Account.

88.     In another instance, this one in 2016, CMG communicated with BofA to confirm the information contained in one of the Letters and, in response, BofA confirmed the information but omitted disclosure of material information concerning the activity in the Trust Account, which information was required to render the letter not misleading.

89.     Plaintiffs reasonably relied on the fact of BofA's Letters as well as all of the false and misleading statements and assurances contained within BofA's Letters when Plaintiffs entered into the Escrow Agreements with Wright Brothers and deposited funds into the Trust Account. Plaintiffs would not have made the payments into the Trust Account but for being provided or otherwise being informed of BofA's issuance of the Letters.

90.     BofA played a critical role in perpetuating and facilitating a wide-spread scheme to defraud Plaintiffs and to steal at least $167 million from Plaintiffs, while itself profiting from its own misconduct. All of the acts taken by BofA's employees alleged herein were taken within the course and scope of their employment and with apparent authority.

## FIRST CAUSE OF ACTION
## ACTUAL FRAUD

91.     Plaintiffs incorporate the allegations in paragraphs 1 through 90 above as though fully set forth herein.

92. Through its Letters, BofA knowingly and directly or indirectly made to Plaintiffs material representations of existing fact that were false and, further, knowingly omitted disclosing material information required to make its disclosure of facts to Plaintiffs complete, accurate, and not misleading.

93. BofA also knowingly omitted from each of Letters material information, including about activity in the Trust Account such as payments that BofA knew were in respect of timing and payees inconsistent with the Trust Account, which information was material to make its representations not misleading.

94. BofA intended – and caused – its Letters and the information int them to be widely provided, directly or indirectly, to parties, including Plaintiffs, that were potential depositors in the Trust Account as a result of entering into escrow agreements with Wright Brothers. BofA intended – and caused – its Letters to make representations that would reasonably cause Trust Account depositors, including Plaintiffs, to believe that Wright Brothers could be trusted to safeguard large sums of money placed in the Trust Account. And BofA intended that its Letters would reasonably cause direct or indirect third party recipients, including Plaintiffs, to rely upon BofA's "Letter of Reference" as BoA's recommendation of Wright Brothers as a trustworthy custodian of funds deposited into the Trust Account.

95. Applicable banking regulations, as well as, upon information and belief, BofA's own internal policies and procedures, required BofA to conduct due diligence on a customer and its accounts before drafting letters including information about that customer and its accounts.

96. Applicable banking regulations, as well as, upon information and belief, BofA's own internal policies and procedures, required BofA review the actual balances in Wright Brothers' accounts before drafting letters that included specific representations about the account balances.

97.     Upon information and belief, BofA complied with its internal and external obligations and, as such, BofA knew or should have known the information stated in the Letters was false and inaccurate or was otherwise rendered misleading by virtue of omissions of other material information.

98.     Alternatively, if BofA did not comply with the obligations to review the actual account balances and the nature of the transactions in the account before making representations about those balances and transactions, BofA was willfully blind or reckless in making the representations and omissions.

99.     BofA's Letters, as well as the false and misleading representations therein and omissions therefrom, were material and issued with the intent that potential Trust Account depositors, including Plaintiffs, would consider and rely upon them. BofA intended that third parties would rely – and Plaintiffs did in fact rely – upon BofA's provision of the Letters and the contents therein, including BofA vouching for Wright Brothers as a good business partner that had not engaged in any suspicious activity, the account balances, the dollar amounts of the transactions in Wright Brothers' accounts, and BofA's assurances that those transactions were indeed "aviation transactions."

100.    As a direct and proximate result of BofA's fraud, Plaintiffs sustained actual damages in an amount in excess of $167 million.

## SECOND CAUSE OF ACTION
## CONSTRUCTIVE FRAUD

101.    Plaintiffs incorporate the allegations in paragraphs 1 through 90 above as though fully set forth herein.

102.    BofA knew that Wright Brothers, as escrow agent, was a fiduciary of Plaintiffs. Moreover, BofA had a confidential relationship with Plaintiffs because it knew that the deposits in

the Trust Account were to be held in escrow and, thus, were subject to limitations and restrictions that are not applicable to typical bank accounts. In addition, BofA knew that Plaintiffs were in fact beneficiaries of the Trust Account.

103.    BofA thus had a confidential or fiduciary duty to Plaintiffs.

104.    Through its Letters, BofA directly or indirectly made to Plaintiffs material representations of existing fact that were false and, further, knowingly omitted disclosing material information required to make its disclosure of facts to Plaintiffs complete, accurate, and not misleading.

105.    BofA also omitted from each of Letters material information, including about activity in the Trust Account such as payments that BofA knew were in respect of timing and payees inconsistent with the Trust Account, which information was material to make its representations not misleading.

106.    BofA intended – and caused – its Letters and the information int them to be widely provided, directly or indirectly, to parties, including Plaintiffs, that were potential depositors in the Trust Account as a result of entering into escrow agreements with Wright Brothers. BofA intended – and caused – its Letters to make representations that would reasonably cause Trust Account depositors, including Plaintiffs, to believe that Wright Brothers could be trusted to safeguard large sums of money placed in the Trust Account. And BofA intended that its Letters would reasonably cause direct or indirect third party recipients, including Plaintiffs, to rely upon BofA's "Letter of Reference" as BoA's recommendation of Wright Brothers as a trustworthy custodian of funds deposited into the Trust Account.

107.    Applicable banking regulations, as well as, upon information and belief, BofA's own internal policies and procedures, required BofA to conduct due diligence on a customer and its accounts before drafting letters including information about that customer and its accounts.

108.    Applicable banking regulations, as well as, upon information and belief, BofA's own internal policies and procedures, required BofA review the actual balances in Wright Brothers' accounts before drafting letters that included specific representations about the account balances.

109.    Upon information and belief, BofA complied with its internal and external obligations and, as such, BofA knew or should have known the information stated in the Letters was false and inaccurate or was otherwise rendered misleading by virtue of omissions of other material information.

110.    Alternatively, if BofA did not comply with the obligations to review the actual account balances and the nature of the transactions in the account before making representations about those balances and transactions, BofA was willfully blind or reckless in making the representations and omissions.

111.    BofA's Letters, as well as the false and misleading representations therein and omissions therefrom, were material and issued with the intent that potential Trust Account depositors, including Plaintiffs, would consider and rely upon them. BofA intended that third parties would rely – and Plaintiffs did in fact rely – upon BofA's provision of the Letters and the contents therein, including BofA vouching for Wright Brothers as a good business partner that had not engaged in any suspicious activity, the account balances, the dollar amounts of the transactions in Wright Brothers' accounts, and BofA's assurances that those transactions were indeed "aviation transactions."

112.     BofA has abused its fiduciary or confidential relationship with Plaintiffs or otherwise took unconscionable advantage of Plaintiffs.

113.     As a direct and proximate result of BofA's constructive fraud, Plaintiffs sustained actual damages in an amount in excess of $167 million.

### THIRD CAUSE OF ACTION
### AIDING AND ABETTING FRAUD

114.     Plaintiffs incorporate the allegations in paragraphs 1 through 90 above as though fully set forth herein.

115.     The Perpetrators knowingly made material misrepresentations and omissions to Plaintiffs concerning aircraft transactions and the refundable deposits placed in the Trust Account by Plaintiffs in connection with those transactions.

116.     The Perpetrators made those material misrepresentations and omissions with the intention that Plaintiffs would act upon those misrepresentations and omissions to their detriment.

117.     In reliance upon those misrepresentations and omissions, Plaintiffs deposited their money in the Trust Account maintained by BofA.

118.     Notwithstanding the terms of Plaintiffs' Escrow Agreements, Plaintiffs' fully refundable deposits were not returned to them when the agreed upon conditions of the aircraft purchase transactions were not completed by the required dates.  Instead, Plaintiffs' refundable deposits were wrongfully withdrawn from the Trust Account and diverted to the Perpetrators for their own purposes, including to "compensate" Wright Brothers for its participation in the Ponzi scheme.

119.     In order to comply with its obligations under the BSA, including the "Know Your Client" requirements, BofA was required to implement programs that adequately prevent, detect, and report suspicious activity, as defined by the BSA and other pertinent statutes.  Suspicious

activity also must be reported to the appropriate authority and reporting protocols must be clearly documented and disseminated throughout BofA's organization. BofA is also required to make clear to all employees that everyone in the organization must play a role in maintaining compliance.

120. BofA, a sophisticated national bank that routinely sets up, maintains, and monitors escrow and trust accounts, and which must comply with its obligations under the BSA, would have detected and become aware that the Perpetrators' withdrawals from the Trust Account were, at a minimum, irregular and suspicious and inconsistent with the nature of the transactions in which Plaintiffs engaged with Wright Brothers. BofA thus either had, or should be deemed to have had, actual knowledge of the Perpetrator's fraudulent scheme.

121. In the alternative, BofA was willfully blind as to the fraudulent activity by intentionally failing to make reasonable inquiries, as required by the BSA, when faced with the suspicion or awareness of the high likelihood of wrongdoing in connection with the Trust Account, and BofA took the affirmative step of drafting the account verification letters and then providing those letters to Wright Brothers, knowing that Wright Brothers would supply the letters to third parties to be used to persuade Trust Account Depositors, like Plaintiffs, to deposit funds into the Trust Account.

122. BofA knowingly and substantially assisted, enabled, and facilitated the commission of Wright Brothers' fraud by providing, at least, seven separate letters over a five-year span, specifically targeted to persuade Trust Account Depositors, like Plaintiffs, to deposit their funds in the Trust Account.

123.     BofA knowingly and substantially assisted, enabled and facilitated the commission of the Perpetrators' fraud by failing to adhere to international, federal, local and internal regulatory banking procedures and policies.

124.     BofA substantially assisted, enabled and facilitated the Perpetrators' fraud through its willful blindness to the pattern of suspicious activity in connection with the Trust Account.

125.     BofA's conduct caused Plaintiffs actual damages in excess of $167 million.

## FOURTH CAUSE OF ACTION
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

126.     Plaintiffs incorporate the allegations in paragraphs 1 through 90 above as though fully set forth herein.

127.     A fiduciary relationship existed between Wright Brothers and Plaintiffs, as parties to the Escrow Agreements.

128.     As the escrow agent, Wright Brothers owed fiduciary duties to Plaintiffs and was only permitted to act in accordance with the terms of the Escrow Agreements and in the best interests of Plaintiffs.

129.     Wright Brothers breached its fiduciary duties by removing Plaintiffs' fully refundable deposits from the Trust Account, in direct violation of the terms of the Escrow Agreements.

130.     Wright Brothers breached its fiduciary duties by not acting in Plaintiffs' best interests when Wright Brothers diverted Plaintiffs Escrow Funds to Machado or Machado-designated entities.

131.     The Trust Account was labeled and described as an escrow and trust account at BofA's bank.  BofA knew that Wright Brothers owed a fiduciary duty to the Trust Account

Depositors, and BofA's bank would have required and maintained the related escrow agreements as part of its procedures when opening an escrow and trust account.

132.    If BofA complied with its legal obligations under the BSA, BofA would have detected and been aware of the suspicious activity in the Trust Account over, at a minimum, a five-year period, through its automated account monitoring systems evidencing Wright Brothers' breach of its fiduciary duties owed to Plaintiffs.

133.    If BofA had detected and reported the suspicious activity in the Trust Account, according to its obligations under the BSA, the Trust Account would have been suspended or terminated before Plaintiffs engaged in the subject transactions, including before they made deposits into the Trust Account.

134.    BofA had actual knowledge of Wright Brothers' breach of fiduciary duties owed to Plaintiffs.

135.    In the alternative, BofA was willfully blind as to Wright Brothers' breach of fiduciary duties by intentionally failing to make reasonable inquiries, as required by the BSA, when faced with the suspicion or awareness of the high likelihood of wrongdoing in connection with the Trust Account.

136.    BofA knowingly and substantially assisted, enabled, and facilitated the Wright Brothers' breach of fiduciary duties owed to Plaintiffs by providing, at least, seven separate letters over a five-year span, specifically targeted to persuade Trust Account Depositors, like Plaintiffs, to deposit their funds in the Trust Account.

137.    BofA knowingly and substantially assisted, enabled, and facilitated Wright Brothers' breach of fiduciary duties owed to Plaintiffs by failing to adhere to international, federal, local, and internal regulatory banking procedures and policies.

138.     BofA substantially assisted, enabled, and facilitated Wright Brothers' breach of fiduciary duties owed to Plaintiffs through its willful blindness to the pattern of suspicious activity in connection with the Trust Account.

139.     BofA's conduct caused Plaintiffs actual damages in excess of $167 million.

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

140.     Plaintiffs incorporate the allegations in paragraphs 1 through 90 above as though fully set forth herein.

141.     In the Letters, BofA directly or indirectly made to Plaintiffs material representations of facts that were false and omitted material information required to make its disclosures to Plaintiffs complete, accurate and not misleading.

142.     BofA also knowingly omitted from each of the Letters material information, including about activity in the Trust Account such as payments that BofA knew were inconsistent with the Trust Account (in respect of timing and payees), which information was material to make its representations accurate, true, and not misleading.

143.     BofA's Letters were intended by BofA to be – and were, in fact – widely provided, directly or indirectly, to potential Trust Account Depositors, including Plaintiffs. BofA's letters intended to – and did – make representations that reasonably caused the Plaintiffs to believe that Wright Brothers could be trusted to safeguard large sums of money placed in the Trust Account.

144.     Applicable banking regulations, as well as, upon information and belief, BofA's own internal policies and procedures, required BofA to conduct due diligence on a customer and its accounts before drafting letters including information about that customer and its accounts.

145.     Applicable banking regulations, as well as, upon information and belief, BofA's own internal policies and procedures, required BofA review the actual balances in Wright Brothers' accounts before drafting letters that included specific representations about the account balances.

146.     Upon information and belief, BofA complied with its internal and external obligations and, as such, BofA knew or should have known the information in the Letters was false and inaccurate or was otherwise rendered misleading by virtue of omissions of material information.

147.     Alternatively, if BofA did not comply with the obligations to review the actual account balances and the nature of the transactions in the account before making representations about those balances and transactions, BofA was willfully blind or reckless in making the representations and omissions.

148.     BofA's false and misleading representations were material and issued with the intent that potential Trust Account depositors, including Plaintiffs, would consider and rely upon the information contained in the Letters, in addition to relying on BofA's vouching for Wright Brothers. Plaintiffs relied upon BofA's provision of the Letters and the contents thereof, including the balance and transaction amounts, BofA's assurances that those amounts related to aviation transactions, and BofA's vouching for Wright Brothers as a trustworthy business partner that would appropriately safeguard the funds deposited into the Trust Account.

149.     BofA's false and misleading representations were material and issued with the intent that Plaintiffs would consider and rely upon the information. Plaintiffs relied upon BofA's provision of the Letters, the information in the Letters, and BofA's vouching for Wright Brothers to make payments into the Trust Account.

150.    As a direct and proximate result of BofA's misrepresentations and omissions, Plaintiffs sustained actual damages in an amount in excess of $167 million.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF SECTION 552, RESTATEMENT (TORTS) SECOND**

151.    Plaintiffs incorporate the allegations in paragraphs 1 through 90 above as though fully set forth herein.

152.    In the Letters, BofA directly or indirectly made to Plaintiffs material representations of facts that were false and omitted material information required to make its disclosures to Plaintiffs complete, accurate and not misleading.

153.    BofA also knowingly omitted from each of the Letters material information, including about activity in the Trust Account such as payments that BofA knew were inconsistent with the Trust Account (in respect of timing and payees), which information was material to make its representations accurate, true, and not misleading.

154.    BofA's Letters were intended by BofA to be – and were, in fact – widely provided, directly or indirectly, to potential Trust Account Depositors, including Plaintiffs.  BofA's letters intended to – and did – make representations that reasonably caused the Plaintiffs to believe that Wright Brothers could be trusted to safeguard large sums of money placed in the Trust Account.

155.    Applicable banking regulations, as well as, upon information and belief, BofA's own internal policies and procedures, required BofA to conduct due diligence on a customer and its accounts before drafting letters including information about that customer and its accounts.

156.    Applicable banking regulations, as well as, upon information and belief, BofA's own internal policies and procedures, required BofA review the actual balances in Wright Brothers' accounts before drafting letters that included specific representations about the account balances.

157.    Upon information and belief, BofA complied with its internal and external obligations and, as such, BofA knew or should have known the information in the Letters was false and inaccurate or was otherwise rendered misleading by virtue of omissions of material information.

158.    Alternatively, if BofA did not comply with the obligations to review the actual account balances and the nature of the transactions in the account before making representations about those balances and transactions, BofA was willfully blind or reckless in making the representations and omissions.

159.    BofA's false and misleading representations were material and issued with the intent that potential Trust Account depositors, including Plaintiffs, would consider and rely upon the information contained in the Letters, in addition to relying on BofA's vouching for Wright Brothers. Plaintiffs relied upon BofA's provision of the Letters and the contents thereof, including the balance and transaction amounts, BofA's assurances that those amounts related to aviation transactions, and BofA's vouching for Wright Brothers as a trustworthy business partner that would appropriately safeguard the funds deposited into the Trust Account.

160.    BofA's false and misleading representations were material and issued with the intent that Plaintiffs would consider and rely upon the information. Plaintiffs relied upon BofA's provision of the Letters, the information in the Letters, and BofA's vouching for Wright Brothers to make payments into the Trust Account.

161.    BofA in the course of its business and in connection with transactions in which it had a pecuniary interest supplied false information for the guidance of Plaintiffs, whom BofA intended would rely upon the guidance in their business transactions with Wright Brothers. In

doing so, BofA failed to exercise reasonable care or competence in communicating the information.

162.    As a direct and proximate result of BofA's breach of duty, Plaintiffs sustained actual damages in an amount in excess of $167 million.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE

163.    Plaintiffs incorporate the allegations in paragraphs 1 through 90 above as though fully set forth herein.

164.    BofA owed a duty to Plaintiffs because (a) it knew that Wright Brothers was a fiduciary of Plaintiffs and knew, or should have known, that Wright Brothers was misappropriating the funds in the Trust Account; (b) it was a party to a transaction (the deposit of Plaintiffs' funds in the Trust Account) who made a decision to speak and had specifical knowledge of material facts to which Plaintiffs did not have access.

165.    BofA knew or should have known that Wright Brothers, one of the Perpetrators of the fraud, intended to provide the Letters to Plaintiffs or otherwise provide Plaintiffs with information contained in the Letters. As foreseeable recipients of the information provided in the comfort and balance verification letters, BofA owed a duty to Plaintiffs to provide only accurate and complete information.

166.    Upon information and belief, pursuant to its internal policies, BofA is responsible for taking measures to ensure that Wright Brothers, and other customers, are not engaged in any suspicious banking activity and to conduct appropriate due diligence on its customers and their accounts. BofA is obligated to consider the type of account, and its size, the pattern of activity, including types and frequency of transactions, among other factors, to assess risks.

167.    Trust accounts formed in private banking departments, like the Trust Account, is a recognized scenario where enhanced due diligence is appropriate.

168.    BofA maintained the Trust Account for Wright Brothers for almost 20 years and was familiar with the typical pattern of activity.

169.    Because trust accounts are designed to safeguard deposits until certain conditions are fulfilled, BofA knew or should have known that Plaintiffs' Escrow Funds deposited in the Trust Account could not be withdrawn unless or until the condition precedents set forth in the escrow agreement had been met.

170.    BofA knew or should have known that the Escrow Funds were to be returned to Plaintiffs upon the occurrence of a condition precedent.

171.    Plaintiffs, as depositors to the Trust Account, were foreseeably impacted by the withdrawal of funds from the Trust Account.

172.    BofA owed a duty to Plaintiffs to exercise the reasonable and ordinary care of competent bank officers in managing and supervising the Trust Account.

173.    Upon information and belief, BofA failed to undertake the recommended enhanced due diligence for a trust account and failed to monitor for suspicious activity.

174.    BofA breached its duty to Plaintiffs by failing to monitor the numerous withdrawals from the Trust Account and by failing to alert Plaintiffs to the atypical and suspicious activities in the Trust Account.

175.    As a direct and proximate result of BofA's negligence, Plaintiffs sustained actual damages in an amount in excess of $167 million.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand as follows:

A.    A judgment awarding damages of at least $167,875,000, plus interest.

B.      Leave to seek punitive damages, in addition to actual damages, in an amount
sufficient to make an example of and to punish BofA.

C.      A judgment awarding Plaintiffs their attorneys' fees as permitted by law.

D.      A judgment awarding Plaintiffs their costs and disbursements as permitted by law.

E.      A judgment awarding Plaintiffs such other and further relief as this Court deems
just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: July 1, 2022                          Respectfully submitted,

                                             BOIES SCHILLER FLEXNER LLP

                                             By: */s/ Stuart H. Singer*_____
                                                  Stuart H. Singer, Esq.
                                                  Fla. Bar No. 377325
                                                  Carlos M. Sires, Esq.
                                                  Fla. Bar No. 319333
                                                  Pascual A. Oliu, Esq.
                                                  Fla. Bar No. 0107737
                                                  401 East Las Olas Blvd., Suite 1200
                                                  Fort Lauderdale, Florida 33301
                                                  Telephone:  (954) 356-0011
                                                  Facsimile:   (954) 356-0022
                                                  Email: ssinger@bsfllp.com
                                                  Email: csires@bsfllp.com
                                                  Email: poliu@bsfllp.com

                                                  John J. Kucera, Esq.
                                                  CA Bar No. 274184
                                                  725 S. Figueroa Street, 31st Floor
                                                  Los Angeles, CA 90017
                                                  Telephone: (213) 995-5758
                                                  Facsimile:  (213) 624-9022
                                                  Email: jkucera@bsfllp.com

                                                  *Attorneys for Plaintiffs*