# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:22-CIV-22541-BER**

METROCITY HOLDINGS, LLC,

      Plaintiff,

v.

BANK OF AMERICA, N.A.,

      Defendant.

_____/

RUSTY 115 CORP. *et al.*,

      Plaintiff,

v.

BANK OF AMERICA, N.A.,

      Defendant.

_____/

**[PROPOSED] FIRST AMENDED COMPLAINT**

Plaintiffs Rusty115 Corp., Hopop Corp., DavidPop Corp., RustyPop Corp., and DaRusty

Corp. (collectively, "Rusty"); Moncler Motors, LLC, BOE 25014, LLC; BOE 30868, LLC; BOE

30874, LLC; BOE 30875, LLC; BOE 34432, LLC; Dash 4542 LLC; Dash 4554 LLC; and Dash

4555 LLC (collectively "Moncler"); CMG 777Escrow3, LLC; CMG 777 Escrow4 LLC; CMG

777Escrow5, LLC; and CMG DHC8Escrow7, LLC (collectively, "CMG "); Bayside Support

Services, LLC ("Bayside"); CCUR Holdings Inc. and CCUR Aviation Finance LLC

(collectively, "CCUR"); and Edidin Partners, LLC ("Edidin") (all of the foregoing, collectively "Plaintiffs") sue defendant Bank of America, N.A. ("BofA") and allege as follows:

## **INTRODUCTION**

1.      Plaintiffs are victims of a Ponzi scheme involving fraudulent aircraft sale transactions enabled by BofA's misrepresentations and omissions to Plaintiffs and BofA's failure to abide by its obligations with respect to the trust account (the "Trust Account") in which Plaintiffs deposited more than $167 million—all of which Plaintiffs have lost as a result of the Ponzi scheme. Knowing that Plaintiffs would rely upon them to make deposits into the Trust Account, BofA issued letters (the "Letters") that knowingly or negligently falsely represented the financial trustworthiness and condition of its customer, Wright Brothers Aviation Title ("Wright Brothers"), whose employees were at the center of the Ponzi scheme, and which BofA told Plaintiffs was a "well respected aviation title company." The Letters also knowingly both misrepresented and omitted material information concerning the amounts and activity in the Trust Account.

2.      Without these representations and omissions by BofA and the comfort of BofA's vouching for Wright Brothers, Plaintiffs never would have entered into the transactions with Wright Brothers and, consequently, never would have transferred millions of dollars into the Trust Account. BofA knew and intended its false and misleading Letters to be used by Wright Brothers to lure third parties like Plaintiffs to participate in the Ponzi scheme. Indeed, BofA knew that the very fact of a highly-respected national bank vouching for Wright Brothers was intended to—and did—cloak with legitimacy both Wright Brothers and the transactions in which Plaintiffs participated.

3.      In its Letters, in addition to providing general assurances about Wright Brothers' excellent standing with BofA and the quality of services Wright Brothers provided to its clients and touting of Wright Brothers as a "well respected aviation title company," BofA provided specific information about Wright Brothers and its accounts, including the dollar amount of aviation transactions that "passed through" Wright Brothers' Trust Account. The Letters included materially false and misleading information, including gross overstatements of the account balances Wright Brothers maintained at BofA, and material omissions, including with respect to the activity of the Trust Account, which BofA knew was inconsistent with an account in which it knew escrow funds relating to aviation transactions were deposited.

4.      The Letters did, however, achieve their intended purpose: to get Plaintiffs to pour millions of dollars into Wright Brothers' Ponzi scheme. On February 24, 2021, Plaintiffs first learned of the enormous scope of the fraud when the U.S. Attorney's Office for the Eastern District of Texas unsealed a third superseding indictment charging Debra Mercer-Erwin ("Mercer-Erwin") and Kayleigh Moffett ("Moffett"), the mother and daughter who, in addition to being Wright Brothers employees were also the company's owner and officer, respectively, with criminal violations, including fraud, money laundering, and narcotics trafficking.[1] It was then that Plaintiffs realized that Wright Brothers, the customer lauded by BofA as a "well respected aviation title company," had stolen their money.

5.      According to the Fifth Superseding Indictment filed in that case, *see U.S. v. Mercer Erwin* [ECF No. 224], "[i]t was the general purpose of the conspiracy for the defendants and their co-conspirators to defraud victim investors, illegally funnel investment money

---

[1] The Department of Justice first indicted Mercer-Erwin and Moffett in a sealed filing in August 2020. *See United States v. Mercer-Erwin*, No. 4:20-00212-ALM-KPJ (E.D. Tex. Aug. 12, 2020) ("*U.S. v. Mercer Erwin*"). That indictment and the first and second superseding indictments remained sealed until the unsealing of the third superseding indictment.

designated for aircraft purchases into foreign investments, and to conceal from the victim investors that their investment funds were not being used to purchased aircraft." On May 3, 2023, Mercer-Erwin was convicted for her part in the scheme. *See* Count Seven, Jury Verdict, [ECF No. 453] filed in *U.S. v. Mercer Erwin*. *Id*. at 41. Among other things, Mercer-Erwin was found guilty of conspiracy to commit wire fraud. *Id*.

<u>**PARTIES, JURISDICTION, AND VENUE**</u>

6.      Plaintiffs Rusty115 Corp., Hopop Corp., DavidPop Corp., RustyPop Corp., and DaRusty Corp. are corporations incorporated in Florida with their principal places of business at 711 N. Ocean Boulevard, Delray Beach, FL 33483.

7.      Plaintiffs Moncler Motors, LLC; BOE 25014, LLC; BOE 30868, LLC; BOE 30874, LLC; BOE 30875, LLC; BOE 34432, LLC; Dash 4542 LLC; Dash 4554 LLC; and Dash 4555 LLC are limited liability companies organized and existing under the laws of the state of Florida, with their principal place of business at 16690 Collins Avenue, Suite 1104, Sunny Isles Beach, FL 33160. None of limited partners of these limited liability companies is a citizen of North Carolina.

8.      Plaintiffs CMG 777Escrow3, LLC; CMG 777Escrow4 LLC; CMG 777Escrow5, LLC; and CMG DHC8Escrow7, LLC are limited liability companies organized and existing under the laws of the State of Florida with their principal place of business at 4141 N.E. 2nd Avenue, Suite 204-A, Miami, FL 33137. None of limited partners of these limited liability companies is a citizen of North Carolina.

9.      Plaintiff Bayside Support Services, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 2 South

Biscayne Blvd, Suite 2680, Miami, FL 33131. None of limited partners of this limited liability company is a citizen of North Carolina.

10.     Plaintiff Edidin Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 3599 Hollywood Oaks Dr., Ft. Lauderdale, FL 33312. None of limited partners of this limited liability company is a citizen of North Carolina.

11.     Plaintiffs CCUR Holdings, Inc. and CCUR Aviation Finance LLC are entities organized and existing under the laws of the State of Delaware with their principal places of business at 3800 N Lamar Blvd, Suite 200, Austin, TX 78756. None of limited partners of CCUR Aviation Finance LLC is a citizen of North Carolina.

12.     Defendant BofA is a national association with its principal place of business at 100 North Tryon Street in Charlotte, North Carolina. BofA is subject to personal jurisdiction in Florida pursuant to Fla. Stat. § 48.193(1)(a)(1) because it operates, conducts, engages in, or carries on a business or business venture in this state and has offices and agencies in this state; and pursuant to Fla. Stat. § 48.193(1)(a)(6)(a) because it caused injury to persons within this state arising out of an act or omission by it outside of this state when, at or about the time of the injury, it engaged in solicitation or service activities within this state.

13.     Although Plaintiffs filed this action in Florida state court, BofA removed this action on the basis of diversity jurisdiction. [D.E. 1.]  Subject matter jurisdiction exists because Plaintiffs and BofA are citizens of different states and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because BofA is subject to the Court's personal jurisdiction with respect to this action and a substantial part of the events or omissions giving rise to the claim occurred in this district.

15.     Plaintiffs reside in this district, the cause of action accrued in this district, and BofA has an office in this district for the transaction of its customary business.

## FACTUAL ALLEGATIONS

### I.      The Ponzi Scheme

16.     The Ponzi scheme perpetrated against the Plaintiffs was straightforward. The Plaintiffs put up, to be held in escrow, substantial deposits for the future purchase of aircraft by others. Plaintiffs were supposed to receive the return of the deposits they advanced once these sales transactions were either consummated or cancelled. In exchange for putting up these deposits, Plaintiffs were paid interest or a fee. To provide assurance to Plaintiffs that their escrowed deposits would be safeguarded, the deposits were to be held in the Trust Account with BofA. When those operating the Ponzi scheme were indicted, Plaintiffs learned that their monies had not been held in escrow in the Trust Account, but had been paid out by BofA and used by the fraudsters for illicit purposes.

17.     To effectuate these transactions, Plaintiffs entered into escrow agreements with Wright Brothers, a third-party agent in the business of providing closing and escrow services in connection with the sale of aircraft (the "Escrow Agreements"). Mercer-Erwin was the owner and senior officer of Wright Brothers and her daughter, Moffett, was an officer of Wright Brothers. Those Escrow Agreements governed the deposit and return of the escrow deposit funds. Wright Brothers was designated as the third-party escrow agent by Federico Andres Machado, who operated the Ponzi scheme in concert with Wright Brothers, Mercer-Erwin, and Moffett.

The terms of Plaintiffs' Escrow Agreements specified that the escrowed funds would be deposited in the Trust Account maintained by BofA. In view of the fact that Plaintiffs would deposit hundreds of millions of dollars, the fact that a bank of BofA's reputation would maintain the Trust Account with the escrowed funds was of critical importance to Plaintiffs.

18.     Although BofA has elsewhere pled that the account was not, in fact, a trust account, BofA labeled the account as a trust account and Wright Brothers' account statements clearly bear the name "Wright Brothers Aircraft Title Inc. Trust Account."

**II.     The Escrow Agreements and Trust Account Deposits**

19.     Between November 2019 and November 2020, Plaintiffs and Wright Brothers entered into Escrow Agreements, each of which identifies the particular aircraft that is the subject of that Agreement by using the aircraft's unique Manufacturer Serial Number ("MSN").

20.     Rusty entered into the following Escrow Agreements:

a.     May 18, 2020 DavidPop Escrow Agreement re MSN 38288.

b.     May 18, 2020 HoPop Escrow Agreement re MSN 38290.

c.     Nov. 12, 2020 Rusty115 Corp Escrow Agreement re MSN 36306.

d.     Nov. 25, 2020 DaRusty Escrow Agreement re MSN 33377.

e.     Nov. 25, 2020 RustyPop Escrow Agreement re MSN 34568.

21.     CMG entered into the following Escrow Agreements:

a.     Nov. 12, 2019 CMG 777Escrow3 LLC Escrow Agreement re MSN 35159.

b.     Nov. 14, 2019 CMG 777Escrow3 LLC re SN 35160.

c.     Nov. 8, 2020 CMG 777Escrow4 LLC Escrow Agreement re MSN 40198.

d.      Aug. 5, 2020 CMG 777Escrow5 LLC Escrow Agreement re MSN 40199.

e.      Aug. 6, 2020 CMG 777Escrow5 LLC Escrow Agreement re MSN 40074.

f.      Aug. 7, 2020 CMG 777Escrow5 LLC Escrow Agreement re MSN 40073.

g.      Dec. 1, 2020 CMG DHC8Escrow7 LLC Escrow Agreement re MSN 4540.

h.      Dec. 1, 2020 CMG DHC8Escrow7 LLC Escrow Agreement re MSN 4542.

22.      Moncler entered into the following Escrow Agreements:

a.      Feb. 7, 2020 BOE 30875 LLC Escrow Agreement re MSN 30875.

b.      Apr. 16, 2020 BOE 30874, LLC Escrow Agreement re MSN 30874.

c.      Apr. 29, 2020 BOE 30868 LLC Escrow Agreement re MSN 30868.

d.      May 18, 2020 BOE 34432, LLC Escrow Agreement re MSN 34432.

e.      July 31, 2020 DASH 4542, LLC Escrow Agreement re MSN 4542.

f.      July 31, 2020 DASH 4554, LLC Escrow Agreement re MSN 4554.

g.      July 31, 2020 DASH 4555, LLC Escrow Agreement re MSN 4555.

h.      Nov. 20, 2020 BOE 25014, LLC Escrow Agreement re MSN 25014.

23.      Bayside entered into the following Escrow Agreements:

a.      July 6, 2020 Bayside Escrow Agreement re MSN 36305.

b.      July 6, 2020 Bayside Escrow Agreement re MSN 36306.

c.      Sept. 11, 2020 Bayside Escrow Agreement re MSN 36319.

d.      Sept. 11, 2020 Bayside Escrow Agreement re MSN 36318.

24.      CCUR entered into the following Escrow Agreements:

a.      May 14, 2020 CCUR Holdings, Inc. Agreement re MSN 34432.

b.      May 14, 2020 CCUR Holdings, Inc. Agreement re MSN 35301.

       c.      Aug. 28, 2020 CCUR Aviation Finance, LLC Agreement re MSN 40342.

       d.      Aug. 28, 2020 CCUR Aviation Finance, LLC Agreement re MSN 40343.

25.     Edidin entered into the following Escrow Agreements:

       a.      May 14, 2020 Edidin Agreement re MSN 34432.

       b.      May 14, 2020 Edidin Agreement re MSN 35301.

       c.      Aug. 27, 2020 Edidin Agreement re MSN 40342.

       d.      Aug. 27, 2020 Edidin Agreement re MSN 40343.

26.     Under the terms of each Escrow Agreement, Wright Brothers was defined as the "Escrow Agent" and the respective Plaintiff was defined as the "Depositor." In the Escrow Agreements, Wright Brothers agreed "to hold, invest, and disburse all funds received from or on behalf of the Depositor" in accordance with the terms of the agreement. Wright Brothers also agreed to, "under no circumstances . . . disburse the Escrow Funds or any portion thereof to any party other than the Depositor," as is customary in aircraft transactions.

27.     The Escrow Agreements also provided that Plaintiffs would wire a specified amount, ranging from $250 thousand to $15 million (the "Escrow Funds") to the Trust Account.

28.     Pursuant to its Escrow Agreements, Rusty made deposits in the aggregate amount of $25,000,000 into the Trust Account, as follows:

| | | | | |
|---|---|---|---|---|
| a. 5/18/20 | DavidPop | 38288 | SU-GDN | $5,000,000. |
| b. 5/18/20 | HoPop | 38290 | SU-GDP | $5,000,000. |
| c. 11/12/20 | Rusty115 | 36306 | VT-ALG | $5,000,000. |
| d. 11/25/20 | DaRusty | 33377 | 9V-SWB | $5,000,000. |
| e. 11/25/20 | RustyPop | 34568 | 9V-SWA | $5,000,000. |

29.    Pursuant to its Escrow Agreements, CMG made deposits in the aggregate amount of $75,000,000 into the Trust Account, as follows:

| | | | | | |
|---|---|---|---|---|---|
| a. | 11/12/19 | CMG 777 ESCROW3 LLC | 35159 | VT-JES | $15,000,000. |
| b. | 11/14/19 | CMG 777 ESCROW3 LLC | 35160 | VT-JEU | $15,000,000. |
| c. | 7/8/20 | CMG 777 ESCROW4 LLC | 40198 | HL-825 | $10,000,000. |
| d. | 8/5/20 | CMG 777 ESCROW5 LLC | 40073 | PK-GIK | $10,000,000. |
| e. | 8/7/20 | CMG 777 ESCROW5 LLC | 40074 | PK-GIA | $10,000,000. |
| f. | 8/5/20 | CMG 777 ESCROW5 LLC | 40199 | HL8284 | $10,000,000. |
| g. | 9/1/20 | CMG DHC8 ESCROW7 LLC | 4540 | ET-AU | $2,500,000. |
| h. | 9/1/20 | CMG DHC8 ESCROW7 LLC | 4542 | ET-AU | $2,500,000. |

30.    Pursuant to its Escrow Agreements, Moncler made deposits in the aggregate amount of $32,875,000 into the Trust Account, as follows:

| | | | | | |
|---|---|---|---|---|---|
| a. | 2/6/20 | BOE 30875, LLC | 30875 | 9V-SQJ | $4,000,000. |
| b. | 4/16/20 | BOE 30874, LLC | 30874 | 9V-SVM | $4,150,000. |
| c. | 4/29/20 | BOE 30868, LLC | 30868 | 9V-SYF | $3,950,000. |
| d. | 5/18/20 | BOE 34432, LLC | 34432 | B-KPC | $4,050,000. |
| e. | 7/31/20 | Dash 4555 LLC | 4555 | 5Y-JXB | $4,575,000. |
| f. | 7/31/20 | Dash 4542 LLC | 4542 | ET-AUE | $4,575,000. |
| g. | 7/31/20 | Dash 4554 LLC | 4554 | 5Y-JXE | $4,575,000. |
| h. | 11/20/20 | BOE 25014, LLC | 25014 | N755CS | $3,000,000. |

31.    Pursuant to its Escrow Agreements, Bayside made deposits in the aggregate amount of $19,000,000 into the Trust Account, as follows:

a. 7/6/2020     Bayside Support Services, LLC   36305   VT-ALF $4,750,000.

b. 7/6/2020     Bayside Support Services, LLC   36306   VT-ALG $4,750,000.

c. 9/11/2020    Bayside Support Services, LLC   36319   VT-ALU $4,750,000.

d. 9/11/2020    Bayside Support Services, LLC   36318   T-ALT   $4,750,000.

32.     Pursuant to its Escrow Agreements, CCUR made deposits in the aggregate amount of $14,000,000 into the Trust Account, as follows:

a. 5/14/2020 CCUR Holdings, Inc.     34432   K-BPC   $2,500,000.

b. 11/13/2020 CCUR Aviation Finance, LLC   34432   K-BPC   $1,750,000.

c. 5/14/2020 CCUR Holdings, Inc.     35301   K-BPH   $2,500,000.

d. 11/13/2020 CCUR Aviation Finance, LLC   35301   K-BPH   $1,750,000.

e. 8/28/2020 CCUR Aviation Finance, LLC   40342   4K-AI01   $2,500,000.

f. 11/27/2020 CCUR Aviation Finance, LLC   40342   4K-AI01   $250,000.

g. 8/28/2020 CCUR Aviation Finance, LLC   40343   4K-AZ81   $2,500,000.

h. 11/27/2020 CCUR Aviation Finance, LLC   40343   4K-AZ81   $250,000.

33.     Pursuant to its Escrow Agreements, Edidin made deposits in the aggregate amount of $2,000,000 into the Trust Account, as follows:

a. 5/14/2020    Edidin Partners LLC   34432   K-BPC   $750,000.

b. 5/14/2020    Edidin Partners LLC   35301   K-BPH   $750,000.

c. 8/27/2020    Edidin Partners LLC   40342   4K-AI01   $250,000.

d. 8/27/2020    Edidin Partners LLC   40343   4K-AZ81   $250,000.

34.     Pursuant to the Escrow Agreements, Plaintiffs collectively deposited in excess of $167 million to the Trust Account with respect to these transactions.

## III.    **The Indictment**

35. On February 24, 2021, in *United States v. Debra Lynn Mercer-Erwin, et al.*, Case No. 4:20-CR-212, in the Eastern District of Texas, the government unsealed a Third Superseding Indictment charging Mercer-Erwin and Moffett (and others, including Machado) with money laundering, wire fraud, aircraft registration violations, and conspiracy to distribute narcotics. On May 5, 2021, the government filed a Fifth Superseding Indictment (the "Indictment") alleging that beginning on an as-yet undetermined date, but no later than 2016, Wright Brothers, through its principals and agents, Mercer-Erwin and Moffett, conspired with Machado and others (together, the "Ponzi Perpetrators" or "Perpetrators") to devise and perpetrate a Ponzi scheme in connection with the putative purchase of commercial aircraft. The government arrested Mercer-Erwin and Moffett and, around December 2020, seized the remaining funds held in the Trust Account maintained by BofA. As of the date of this filing, Machado is outside of the United States and is the subject of extradition proceedings brought by the U.S. Department of Justice.

36. As detailed in the Indictment, the Perpetrators used fraudulent or fictitious buyers, including South Aviation, Inc. ("South Aviation"), Machado's company, to induce individuals and entities – including Plaintiffs – to invest in the Ponzi scheme by depositing money in the Trust Account maintained by BofA.

37. After Plaintiffs' funds were deposited into the Trust Account, they were not kept in the Trust Account as required by the Escrow Agreements, but instead were illicitly diverted from the Trust Account to Machado or Machado-designated entities. In some instances, the monies were transferred out of the Trust Account on the same day they were deposited, contrary to the nature and purpose of an escrow account in the aviation sales business.

38. As detailed in the Indictment, the Ponzi scheme consisted of the following four steps:

a.       Pursuant to the Escrow Agreements, in exchange for receipt of interest or a fee, a Plaintiff agreed to provide the fraudulent buyer (*e.g.,* South Aviation) with a refundable deposit, which the fraudulent buyer purported would be used as security for the purchase of the aircraft.

b.       The fraudulent buyer designated the Trust Account maintained at BofA to hold in escrow the Plaintiff's money.

c.       The Escrow Agreements required that the Plaintiff's money be fully refunded from the Trust Account unless the putative buyer successfully completed an inspection of the aircraft by a date certain. Notwithstanding that an inspection did not take place due to the fraudulent nature of the scheme, the Perpetrators did not refund the Plaintiff's deposit, instead illicitly transferring it to other accounts. In addition to the funds the Perpetrators diverted to others, they also used funds from the Trust Account in order to "compensate" themselves for the fraudulent transactions.

d.       To perpetuate the Ponzi scheme, another deposit would be secured from another victim for the purported purchase of a different aircraft. This deposit was then used to pay the principal and interest owed to another victim of a previous fraudulent transaction. This Ponzi cycle continued until the unsealing of the indictment, at which point Plaintiffs became aware that they had suffered their losses.

39.       Wright Brothers allowed South Aviation and Machado access to Plaintiffs' funds that were deposited in the Trust Account. Mercer-Erwin, Moffett, and other Perpetrators with access to the Trust Account, then transferred funds, including Plaintiffs' funds, from the Trust Account to other accounts for their own illicit, personal use.

**IV.**    **BofA's Relationship with Wright Brothers and Knowledge of Escrow**

40.     Since at least August 2, 2002, BofA has maintained Wright Brothers as a banking customer. On that date, Mercer-Erwin, as President and Secretary of Wright Brothers, executed corporate signature cards for two Wright Brothers business bank accounts: (1) the Operating Account ("Wright Brothers Aircraft Title, Inc. Operating Account," ending in *9081) and (2) the Trust Account ("Wright Brothers Aircraft Title, Inc. Trust Account," ending in *9094). The signature card provided by BofA and all the bank statements from the Trust Account clearly identify it as a "Trust Account," while the bank statements for the operating account identified it as an "Operating Account." In one of the Letters, BofA identified the account as the "Wright Brothers Aircraft Title, Inc. Trust Account." Since Wright Brothers and BofA established the Operating Account and the Trust Account, BofA has earned fees from maintaining those accounts.

41.     BofA denies that the Trust Account account was a "trust account."

42.     In contrast to a typical "operating account," where funds can be withdrawn at will by the account holder for whatever purpose, the Trust Account that BofA maintained for Wright Brothers was designed and intended to provide a safe and reliable method of securing deposited escrow funds. The Trust Account was designed to hold in escrow funds on behalf of Plaintiffs until the inspection of the aircraft and other steps related to the aircraft purchase transaction were completed. Wright Brothers, as the escrow agent, owed Plaintiffs a fiduciary duty to keep the escrowed funds secure until the fulfillment of certain conditions of the transactions. Following satisfaction of the conditions, Wright Brothers had a fiduciary duty to dispense the escrowed funds, and then only as permitted by the escrow agreement.

43.     For several reasons, BofA knew or should have known of the nature of the relationship between Wright Brothers and Plaintiffs and, specifically, that Wright Brothers held

itself out as an escrow agent with respect to the funds in the Trust Account and owed Plaintiffs a fiduciary duty:

a.     BofA itself has experience in aviation transactions, including with respect to escrowed deposit funds. In fact, the leasing arm of BofA has been involved as a seller (either directly or through agents) in transactions where Wright Brothers has been the escrow agent and where BofA has been designated as Wright Brother's bank. In one such transaction for the purchase of an aircraft by a limited liability company managed by the entity that manages the CMG Plaintiffs, BofA's affiliate executed a security deposit escrow agreement with Wright Brothers. The agreement provided that Wright Brothers would hold the CMG entity's deposit "in escrow." BofA thus knew from its own participation in aviation transactions that they involve the holding deposits in escrow and, specifically, that Wright Brothers acted as an escrow agent.

b.     BofA is experienced in aviation transactions, which typically involve the holding of deposits in escrow by aviation title companies. BofA's aircraft leasing and financing arm touts its "specialized aviation expertise"[2] and characterizes itself as "a leader in the corporate aircraft market."[3]   In the Letters, BofA touted its knowledge of aviation title companies when represented to Plaintiffs that Wright Brothers was a "respected aviation title company." It is a fact known in the aviation industry that an aircraft title company provides escrow services, including with respect to deposits.

c.     BofA was specifically aware that Plaintiffs' funds were to be held in escrow by Wright Brothers as a result of communications in which that fact was disclosed. Those

---

[2] Found at www.leasingportalonline.bankofamerica.com.

[3] Found at https://centreforaviation.com/data/profiles/lessors/bank-of-america-leasing.

communications included 2016 communications with CMG and Moncler and 2019 communications with Metrocity Holdings, LLC.

        d.     BofA also received at least one Escrow Agreement. The Escrow Agreement made clear that the funds deposited in the Trust Account were deposits to be held in escrow by Wright Brothers and that the funds could not be disbursed to any party other than the depositor Plaintiff.

        e.     BofA confirmed that it had knowledge of Wright Brothers' business when it responded to a "314(b) Information Sharing Request" pursuant to the Patriot Act from Wells Fargo Bank in September 2018 concerning fraud with respect to a wire sent from the Trust Account to a Wells Fargo customer. In that inquiry, Wells Fargo asked BofA "what industry" Wright Brothers was involved in. BofA referred Wells Fargo to the page of Wright Brothers' website (http://wbaircraft.com/services/) on which the services provided by Wright Brothers were listed, showing that BofA knew that Wright Brothers' website listed the company's services and had accessed that portion of the services. As of August 2018, the first listed service was "escrow service." In discussing its escrow services, Wright Brothers touted its "long standing relationship with Bank of America Merrill Lynch for all international transactions." The other services listed as provided by Wright Brothers were "title search," "document filing," "title clearing," and "N-number reservation." None of these other services involved Wright Brothers maintaining an account holding millions of dollars – only the escrow services did – which is why only in relation to its escrow services did Wright Brothers tout its "long standing relationship" with BofA. The Wright Brothers website also discussed the role of escrow agents in aviation transactions: "Escrow Agents act as neutral 3rd parties that can hold funds in a bonded and

insured bank account, to be distributed at a set time and according to terms that are agreed upon by all the parties to a transaction."

In addition, BofA represented to Wells Fargo that the transactions in the Trust Account were consistent with Wright Brothers' services. Wells Fargo specifically asked BofA the following question: "Does Bank of America consider transactions involving Wright Brothers Aircraft Title Inc. consistent with their industry?" BofA responded as follows: "Yes. Client is a title and escrow services provider facilitating aircraft purchases." This response makes clear that BofA knew the nature of Wright Brothers' business and had determined that "transactions involving Wright Brothers" were "consistent with their industry." Given that the only service provided by Wright Brothers that would involve the deposit, withdrawal, or transfer of large sums of money (typically deposits in the millions of dollars) was that of escrow agent, BofA's response consisted of a representation that it had examined the Trust Account to determine whether the activity of the account was consistent with that of an account holding escrow funds.

44. In view of the foregoing, BofA knew (or should have known) that Wright Brothers held Plaintiffs' funds in the Trust Account in escrow and, consequently, that there existed a fiduciary relationship between Wright Brothers and Plaintiffs.

## V.      BofA's Responsibilities and Obligations with Respect to the Trust Account

45. In addition to its knowledge of Wright Brother's business and about the nature of the escrowed funds deposited in the Trust Account, as a federally insured national association, BofA must comply, *inter alia*, with the provisions of the Bank Secrecy Act (31 U.S.C. §5311 *et seq.*) ("BSA"), which was enacted to prevent financial institutions from being used to hide and disguise money used in furtherance of criminal enterprises or other unlawful activities. Beyond

protecting the overall economy from the corrosive impacts of money laundering, BSA reporting can help protect individuals from fraud and theft of their assets.[4]

46.     The BSA establishes the standard for protective policies and procedures that govern all banking transactions. To comply with the requirements of the BSA, BofA is required to establish internal policies, procedures, and controls that are custom-tailored to the specific and unique aspects of BofA's operations, including designation of specific officers to review compliance, employee training, independent testing, and customer due diligence. BofA also must implement programs that adequately prevent, detect, and report suspicious activity, as defined by the BSA and other pertinent statutes. These programs must reflect BofA's specific risks and requirements.

47.     BofA also must institute ongoing internal monitoring and review, as well as independent monitoring and audits, to ensure compliance with its obligations. Further, BofA must perform specific, risk-based due diligence focused on identified concerns or threats for suspicious transactions. As part of this due diligence, BofA must ensure strict compliance with the BSA's "Know Your Customer" requirements, such as verifying the identity, suitability, and risks involved with maintaining a business relationship with all customers, including Wright Brothers, one of the Perpetrators of the fraud.

48.     The "Know Your Customer" requirements are critical tools to improve BofA's view of its clients' identities and business relationships and to prevent BofA from participating in or facilitating illicit transactions, like the ones the Perpetrators ran through the Trust Account. The "Know Your Customer" obligations require that BofA must understand the nature of its

---

[4] *See, e.g.*, https://www.fincen.gov/news/news-releases/fincen-analysis-bank-secrecy-act-reports-filed-financial-institutions-help.

customers' activities (including those of Wright Brothers) in order to ensure that the customer's funds are from a legitimate source. The "Know Your Customer" requirements provide only a baseline for performing customer due diligence, which BofA was required to supplement by its own assessment of the risk profile of the customer, including that of Wright Brothers.

49.     Enhanced Due Diligence ("EDD"), the collection of additional customer information, is mandated in connection with certain higher-risk customers or circumstances. In those circumstances, financial institutions, like BofA, are responsible for determining the risks and taking measures to ensure that customers, such as Wright Brothers, are not bad actors. This required that BofA consider the type of account, its size, and the pattern of activity, including types and frequency of transactions, among other factors, to assess account risk and to determine whether EDD is required.

50.     Trust accounts, including the one at issue here, are the type of account with respect to which EDD is appropriate. Periodic reviews by a financial institution of its trust accounts and the associated risks are also considered best practices. BofA has internal policies and procedures, designed to ensure compliance with the BSA in general, and the "Know Your Customer" requirements specifically, that require BofA to apply EDD to trust accounts, including the Trust Account.

51.     To comply with EDD requirements, it is standard industry practice for banks, like BofA, to have an automated account monitoring system that will examine transactions to identify the typical attributes of fraudulent transactions, including the common characteristics of transactions related to a Ponzi scheme. A standard automated account monitoring system sends an alert each and every time there is a deposit, withdrawal, or any transaction with suspicious attributes.

52.     BofA maintains a risk-based Anti-Money Laundering program which includes risk-based procedures for conducting ongoing customer due diligence, including conducting ongoing monitoring to identify and report suspicious transactions. BofA has developed a system to identify suspicious activity and to analyze that activity. As part of this system, BofA uses a variety of different means, such as automated monitoring and employee referrals to identify suspicious transactions. The information in this system disclosed that the Wright Brothers' transactions were not consistent with the nature of the Account. BofA thus had the means – and an obligation – to review the information gathered by this system. It avoided doing so.

## VI.    BofA Supplied the Perpetrators with False and Misleading Information That Enabled the Perpetrators to Commit Fraud

53.     The cornerstone of the scheme to defraud Plaintiffs was the Perpetrators' ability to convince Plaintiffs to deposit funds in the Trust Account. In order to accomplish that goal, BofA provided the Letters with respect to Wright Brothers that were intended to assure Plaintiffs, and other victims, of the legitimacy and solvency of Wright Brothers and its operations.

54.     It is not uncommon for banks to issue comfort and balance verification letters, which are written undertakings designed to provide assurance to third parties with respect to the bank's customer with whom the recipient is considering doing business. Where a bank provides a comfort or balance verification letter in connection with a transaction, the recipients of the letter foreseeably and reasonably rely on the assurances provided in the letter in deciding whether to proceed with the proposed transaction. That is the case with Plaintiffs.

55.     Because comfort and balance verification letters are critically significant to third parties who have knowledge of them, including Plaintiffs – and because of the potential risks and exposure to the bank associated with issuing such letters – a prudent bank maintains stringent

policies and procedures in connection with drafting, reviewing, and issuing such letters in order to ensure that the information contained therein is accurate, complete, and truthful, as that information will be relied upon by third parties doing business with the bank's customer. BofA has internal policies and procedures that govern the content and provision of comfort and balance verification letters.

56.     From 2015 to 2020, BofA furnished Wright Brothers with multiple comfort and balance verification letters with the intent and knowledge that Wright Brothers and other Perpetrators would both provide those letters to potential victims of the Ponzi scheme and tout to victims the fact of its issuance of those letters, all to assure them that Wright Brothers could meet its financial and contractual obligations in connection with the sales and purchases of aircraft and induce deposits into the Trust Account. The Letters announced themselves as "letter[s] of reference" regarding the "relationship between Wright Brothers [and BofA]" indicating that BofA understood and intended that the letters would be provided to – and relied upon by – potential victims of the Ponzi scheme, including Plaintiffs. By providing the Letters, BofA cloaked its "well respected" customer Wright Brothers in its reputation, enabling the Perpetrators to gain the confidence of Plaintiffs.

A.     **The August 2015 Letter**

57.     On August 20, 2015, BofA issued a Letter addressed "To Whom It May Concern" (the "August 2015 Letter"):

> I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.
>
> Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 14 years. All of their accounts are in excellent standing. Wright Brothers Aviation Title has authorized me to tell you that over $380MM dollars in aviation transactions have passed through their accounts in the past 6 months, annualizing at over $760MM. We

have never received a complaint having to do with the services they provide to their clients.

If you have any additional questions regarding our relationship with this respected aviation title company, you may reach out to me directly.

58.     The August 2015 Letter was signed by Brandon G. Ellis ("Ellis"), Vice President and Business Banking Client Manager at BofA's financial center located at 211 N. Robinson Ave, Oklahoma City, Oklahoma.

59.     The August 2015 Letter was received by Moncler and Rusty.

**B.      The December 2015 Letter**

60.59.  On December 7, 2015, BofA issued a Letter addressed "To Whom It May Concern" (the "December 2015 Letter"):

I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.

Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 14 years. All of their accounts are in good standing. Wright Brothers Aviation Title has authorized me to tell you that over $320MM dollars in aviation transactions have passed through their accounts in the past 6 months, annualizing at over $640MM.

If you have any additional questions regarding our relationship with this respected aviation title company, you may reach out to me directly.

The December 2015 Letter was signed by Ellis and included his title, Vice President and Business Banking Client Manager, and identified his affiliation with BofA's financial center located at 211 N. Robinson Ave, Oklahoma City, Oklahoma.

61.     The December 2015 Letter was received by CMG.

**C.      The July 2016 Letter**

62.60.  On July 5, 2016, BofA issued a Letter to Mercer-Erwin (the "July 2016 Letter"):

> Per your request, Wright Brothers Aircraft Title, Inc. has been a customer of Bank of America Merrill Lynch since October 18, 2001 and has maintained an aggregate average collected deposit balance of $11,818,006.50 over the past twelve months.

63.61.  The July 2016 Letter was signed by Mark Fish ("Fish"), Senior Vice President and Business Banking Relationship Manager for BofA.

64.62.  The first page of each of the Wright Brothers' Trust Account monthly account statements reflects the average ledger balance for each corresponding month.

65.63.  The first page of each of the Wright Brothers' Trust Account monthly statements reflects the average ledger balance for the month. BofA's reference to the "aggregate average collected deposit balance of $11,818,006.50" in the July 2016 Letter appears to have been calculated accurately based on the average ledger balances for the 12 months identified in the letter.

**D.**     <u>The January 2017 Letter</u>

66.64.  On January 11, 2017, BofA issued a Letter to Mercer-Erwin (the "January 2017 Letter"):

> Per your request, Wright Brothers Aircraft Title, Inc. has maintained an aggregate average collected deposit balance of $11,648,172.00 over the past twelve months.

67.65.  The January 2017 Letter was signed by Fish, Senior Vice President and Business Banking Relationship Manager.

68.66.  The first page of each of the Wright Brothers' Trust Account monthly statements reflects the average ledger balance for the month. BofA's reference to the "aggregate average collected deposit balance of $11,648,172.00" in the January 2017 Letter appears to have been calculated accurately based on the average ledger balances for the 12 months identified in the letter.

E.     **The April 2017 Letter**

~~69.~~67.   On April 27, 2017, BofA issued a Letter (the "April 2017 Letter") to Mercer-Erwin, stating: "Per your request, the total amount of all deposits made into the Wright Brothers Aircraft Title, Inc. escrow account in calendar year 2016 was $405,612,916.62."

~~70.~~68.   The April 2017 Letter was signed by Fish, Senior Vice President and Business Banking Relationship Manager.

~~71.     The April 2017 Letter was received by CMG.~~

F.     **The February 2018 Letter**

~~72.~~69.   On February 26, 2018, BofA issued a Letter to Mercer-Erwin (the "February 2018 Letter"), stating:

> I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.
>
> Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 17 years. All of their accounts are in excellent standing. Wright Brothers Aviation Title has authorized me to tell you that their average volume over the last 6 months has been $183MM. We have never received a complaint having to do with the services they provide to their clients.
>
> If you have any additional questions regarding our relationship with this well respected aviation title company, you may reach out to me directly.

~~73.~~70.   The February 2018 Letter was signed by Elizabeth Haralson ("Haralson"), then a Relationship Manager in the Business Banking Unit of BofA's Oklahoma City, Oklahoma office.

~~74.     The February 2018 Letter was received by CMG and Rusty.~~

G.     **The January 2019 Letter**

~~75.~~71.   On January 24, 2019, BofA issued a Letter addressed "To Whom It May Concern" (the "January 2019 Letter") stating:

I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.

Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 18 years. All of their accounts are in excellent standing. Wright Brothers Aviation Title has authorized me to tell you that over $257 MM dollars in aviation transactions have passed through their account in the past 6 months, annualizing at over $515 MM. We have never received a complaint having to do with the services they provide to their clients.

If you have any additional questions regarding our relationship with this well respected aviation title company, you may reach out to me directly.

76.72.  The January 2019 Letter was signed by Haralson, then Vice President of Business Banking. The January 2019 letter included the address of BofA's financial center located at 211 N. Robinson Ave, Oklahoma City, Oklahoma in the footer.

77.    The January 2019 Letter was received by CMG.

**H.**    **The March 2019 Letter**

78.73.  On March 1, 2019, BofA issued a Letter to Mercer-Erwin (the "March 2019 Letter"):

Per your request, Wright Brothers Aircraft Title, Inc. has been a Bank of America customer since 10/2001 and has maintained an aggregate average collected balance of $25,700,936.26 over the past six months.

79.74.  The March 2019 Letter was signed by Haralson, then Senior Vice President and Business Banking Relationship Manager for BofA.

**I.**    **The August 2019 Letter**

80.75.  On August 9, 2019, BofA issued a Letter to Mercer-Erwin (the "August 2019 Letter"):

> Per your request, Wright Brothers Aircraft Title, Inc. has been a Bank of America customer since 10/2001 and has maintained an average collected balance of $33,938,782.00 over the past six months.

81.76.  The August 2019 Letter was signed by Haralson, then Senior Vice President and Business Banking Relationship Manager for BofA.

82.77.  The Letters included general and specific representations about the legitimacy, stability, and creditworthiness of Wright Brothers, describing BofA's "strong banking relationship" with Wright Brothers, identifying Wright Brothers' status as "in excellent standing," stating that BofA "had never received a complaint having to do with the services [Wright Brothers] provide to their clients," and providing account information concerning aviation transactions. Also, each letter spoke to the legitimacy of Wright Brothers in the aviation industry by specifically referring to it as a "well respected aviation title company."

83.78.  The Letters were widely provided to potential depositors in the Trust Account for whom BofA knew the letters were intended. BofA knew that the Letters were being provided directly to potential depositors in the Trust Account, such as Plaintiffs, and additionally knew or should have known that the substance of the Letters, and the very fact that BofA had issued the Letters, was the subject of disclosures and representations to and among potential trust account depositors, such as Plaintiffs, who entered into escrow agreements with Wright Brothers and who relied on those facts to decide to make deposits into the Trust Account.

84.79.  The letters were "letters of reference," which were either addressed to Mercer-Erwin of Wright Brothers (who did not need to know information already known to her) or "to whom it may concern," and were issued for the purpose of having them reach third parties such as Plaintiffs to induce reliance on them. Plaintiffs reasonably understood the letters to be letters of reference and relied upon them as such.

85.80.  BofA did not limit to whom the Letters would be given or disclosed and, on the contrary, knew or had reason to know that Mercer-Wright and Machado used the issuance and existence of the Letters to lure investors who would deposit escrow funds in the Trust Account. In this way, the misrepresentations and misleading statements in the Letters were made directly or indirectly to each of the Plaintiffs, each of whom relied upon them.

86.81.  BofA knew that potential parties to escrow agreements with Wright Brothers who would deposit funds into the Trust Account but who may not have received the Letters directly from BofA were also made aware of the Letters and the information contained therein and relied upon the letters to make deposits in the Trust Account.

82.     Although the Letters were not addressed to Plaintiffs, the Plaintiffs either received copies of the Letters or were told about the issuance, existence, and substance of the Letters:.

     a.      The CMG Plaintiffs received the letter dated December 7, 2015 on March 6, 2016 by way of an email from Mercer-Erwin. They received the letter dated April 27, 2017.  Although they do not recall the precise date on which, or from whom, they received this letter, they received it before the deposits at issue (and identified below) were made.  They received the February 26, 2018 letter on that date by way of an email from Machado.  And they received the January 24, 2019 letter on that same date, also by way of an email from Machado.  In addition, the principal of the CMG entities in 2016 to spoke to BofA officer Mark Fish and in 2018 or 2019 to BofA officer Elizabeth Haralson (both of whom signed letters) concerning the aircraft transactions, BofA's relationship with Wright Brothers, and the letters, and he advised them that he was depositing moneys into the Trust Account to be held in escrow as deposits for aircraft transactions.  In reliance on the letters and telephone conversations, the CMG Plaintiffs made deposits in the Trust Account on November 12, 2019, November 14, 2019, July 8, 2020, August 5, 2020, August 7, 2020, and September 1, 2020.

b.      The Rusty Plaintiffs received the August 20, 2015 letter as early as December 2017 but, in any event, by February 16, 2018, from their representatives who had received the letter from Mercer-Erwin in December of 2015.  They received the February 26, 2018 letter on that date, just days before their first transaction involving Wright Brothers, by way of an email from Mercer-Erwin to Christopher Younger.  The Rusty Plaintiffs were advised that these letters were consistent with other letters BofA had issued endorsing and providing assurances regarding Wright Brothers. In reliance on the letters, the Rusty Plaintiffs made deposits into the escrow account on May 18, 2020, November 12, 2020, and November 25, 2020.  But for receiving these letters, the Rusty Plaintiffs would not have entered into transactions with Wright Brothers and would not have made deposits into the Trust Account.

c.      The Moncler Plaintiffs received the August 20, 2015 letter on December 28, 2017 by way of an email from Machado.  In approximately September 2018, a principal of the Moncler Plaintiffs spoke with the principal of the CMG Plaintiffs, who informed him of the letters the CMG Plaintiffs had received.  In addition, in or about 2016, a principal of the Moncler Plaintiffs inquired of an officer at BofA as to the bank's relationship with Wright Brothers, during which he advised the officer of the nature of the transactions the Moncler entities were entering into with Wright Brothers (*i.e.*, making escrow deposits).  A few days later, the BofA officer responded to the Moncler representative's inquiry and advised him that Wright Brothers and Mercer-Erwin were longtime clients in good standing, maintained substantial deposits at the bank, enjoyed an excellent reputation at the bank, and that the bank had properly operated the Trust Account. In addition every time Moncler Plaintiffs made a deposit, Mercer-Erwin and/or Machado referenced the fact that BofA, where the deposits were being held, had issued letters of reference/comfort on behalf of Wright Brothers. In reliance on the letters and the conversations, the Moncler Plaintiffs made deposits into the escrow account on February 6, 2020, April 16, 2020, April 29, 2020, May 18, 2020, July 31, 2020, and November 20, 2020.

d.      In or about August 2017, in the course of conducting due diligence on Wright

Brothers, the Bayside Plaintiff's representative was advised by a Moncler principal that BofA had issued letters in which it endorsed and recommended Wright Brothers.  Specifically, he was advised that Moncler had received from an officer of BofA an endorsement of Wright Brothers, including that Wright Brothers and Mercer-Erwin were longtime clients in good standing, maintained substantial deposits at the bank, and enjoyed an excellent reputation at the bank and that the bank had properly operated the Trust Account.  In or about January 2018, Plaintiff Bayside's representative was advised by Plaintiff Moncler's representative of a letter issued by BofA,  which letter was quoted in part and provided an endorsement and recommendation of Wright Brothers.  In addition, prior to making the deposits at issue in this case, Machado repeatedly advised Plaintiff Bayside that other aircraft finance participants had confirmed the trustworthiness of Wright Brothers through BoA, including by way of the letters.  In reliance on these conversations about BofA's issuance of the reference and comfort letters, the Bayside Plaintiffs made deposits into the escrow account on July 6, 2020 and September 11, 2020.

e.      No later than May 14, 2020, and before their first deposit into the Trust Account, they were advised by Machado that BofA had issued the letters, in which it vouched for Wright Brothers, including by providing financial information reflecting the favorable financial condition of the company, its strong relationship with BofA, and its good reputation in the aviation finance industry.  In reliance on these conversations about the reference and comfort letters, the CCUR/Edidin Plaintiffs made deposits into the escrow account on May 14, 2020, August 27, 2020, August 28, 2020, November 13, 2020, and November 27, 2020.

87.

## V.      **The Letters Were Materially False and Misleading**

88.83.  The Letters were materially false, contained material omissions that rendered them misleading, and misrepresented information about Wright Brothers' accounts, including account activity and balances:

a.     The August 2015 Letter, the December 2015 Letter, and the January 2019 Letter were misleading because they failed to disclose facts necessary to make them complete and accurate.   Disclosure of the amount of funds withdrawn from the Account was necessary to make the disclosure of the "passed through" amount not misleading to those contemplating depositing their escrow funds in the Trust Account.

b.     The August 2015 Letter, the December 2015 Letter, and the January 2019 Letter were false as to the representation that the referenced fund volumes were in connection with "aviation transactions" when, in fact, the volumes included funds not related to aviation transactions and included funds that were deposited as a result of the Ponzi scheme and thus were not funds deposited or used in connection with real aviation transactions.

c.     The April 2017 Letter was misleading because it failed to disclose the amount of withdrawals or transfers from the Trust Account or the nature and timing of those withdrawals and transfers. This information was necessary to make the disclosure as to the amount of deposits not misleading to a potential depositor in the Trust Account who relied on the letter as a representation that Wright Brothers complied with its escrow obligations. Had the omitted information been disclosed, it would have revealed that the deposits into the Trust Account were not, in fact, maintained in a manner consistent with funds held in escrow.

d.     The February 2018 Letter was misleading with respect to its reference to an "average volume" because BofA failed to disclose what constituted "volume." To the extent the term "volume" referred to credits and deposits, the statement was false. According to BofA's bank statements, Wright Brothers had a *total*, not an average, volume of $183 million in credits and deposits during that time period. This numerical representation was thus not the result of clerical error. It was, instead, calculated by adding up the total deposits for a six-month period

and not an "average." The average amount in the Account during that time period was in fact around $31.5 million, or only approximately one-fifth of the $183 million represented in the letter.

e.      The March 2019 Letter and the August 2019 Letter were misleading because, in representing the amount of the "average collected balance," BofA failed to disclose that it had applied a methodology different than the one used to calculate the amounts in the January 2017 Letter and the April 2017 Letter, which used a methodology tied to the average ledger balance that appears on each monthly statement for the Trust Account. Using the previous methodology, Wright Brothers' true "aggregate average collected balance" during the six-month period specified in the March 2019 Letter was only $11,220,149.21, less than half the $25,700,936.26 represented in the letter. And using the previous methodology, Wright Brothers' true "aggregate average collected balance" during the six-month period specified in the August 2019 letter would be $5,664,940. This was also not the result of clerical error. BofA later confirmed that the two letters were accurate after they had been received by a depositor in the Trust Account.  Rather than calculating the "average collected balance" based on the average ledger balances reflected on the monthly account statements, it appears BofA added the total deposits in the first and last month of the referenced period and divided that number by two. This is not an accepted methodology for banks to calculate the average collected balance in an account and is contrary to BofA's own internal definition of the term "collected balance." In addition, BofA failed to disclose the material fact that it had calculated the information in the March 2019 Letter and the August 2019 Letter in a manner different from that it had used with respect to the prior Letters.

89.84.   BofA has denied that Wright Brothers maintained a "trust" or "escrow" account with Bank of America. If that is so, the April 2017 Letter was materially false in that it explicitly referred to the Trust Account as an "escrow account."

90.85.  In addition, the Letters were false in representing that Wright Brothers "maintained a strong banking relationship with Bank of America," that Wright Brothers' "accounts are in excellent standing," and that Wright Brothers was a "well respected aviation title company." BofA was in possession of information that belied the representations, including information that established that Wright Brothers was not treating the funds in the Trust Account as escrow funds, which BofA knew was the nature of those funds.

91.86.   The Letters that were issued by Haralson adopted a new methodology inconsistent with the methodology used in prior letters and inconsistent with BofA's internal processes, policies, and practices. The effect was to grossly inflate the balance of the Trust Account over several years. Nothing about the Letters was a "routine banking service."

92.87.   BofA's assertion in its answer to Metrocity's complaint that the account was not a trust account flies in the face of the label on the account, and the reference in at least one of the letters to the account as an escrow account. Those are blatantly false representations if the Bank did not consider the account a "trust account."

93.88.   As the institution maintaining the Trust Account, BofA knew that this information in the Letters was false and inaccurate or misleading. The representations concerning the Trust Account were critical to Plaintiffs' decision to pay the deposits because they provided Plaintiffs with assurances and verification that the Trust Account was secure and contained more than sufficient funds to pay back their escrowed deposits, and further communicated that Wright Brothers was engaged in a legitimate aircraft financing operation.

## VI.    The Letters Violated BofA's Internal Policies

94.89.   BofA maintains what it refers to as a "Formal Letters & Correspondence" policy (the "Letters Policy"). The Letters Policy sets forth "detailed procedures" to "ensure" that letters sent by BofA "are suitable to the situation and follow appropriate protocols." BofA employees are required to "understand and implement the procedure" set forth in the Lettes Policy and BofA managers are required to "ensure all employees understand the procedure and incorporate the procedure into daily routines."

95.90.   According to the Letters Policy, letters written at the request of bank clients "must have consistent content to eliminate or reduce risk to the bank" and "must comply with policies/standards/procedures. The Letters Policy prohibited BofA employees from sending out letters "outside of the scope of defined procedures … without contacting Contract Management."

96.91.   At the time the Letters were issued, the Letters Policy provided, among other things, that:

      a.     "Customized letters must contain only objective facts, such as the length of the Bank's relationship with the client, average amounts maintained on deposit with the Bank, e.g., mid-six figure range, and amount of credit commitments."

      b.     "Opinions or other subjective assessments, e.g., the client is reliable, able to complete a transaction, or has any particular expertise or capability, must be avoided."

      c.     "A letter should never be addressed "To Whom It May Concern.""

      d.     Letters "cannot contain subjective value judgments or opinions about the customer, its ability to complete a proposed business transaction or other matters beyond the knowledge or control of the Bank."

e.      "All information in the letter must be accurate as of the date of the letter and be restricted to facts or information that the Bank is able to verify."

f.      "The request [for the letters] must be related to an identifiable purpose, project/contract, or be trade related."

g.      "Letters must be signed by an AVP or above."

97.92.  The Letters Policy provided that "[t]he appropriate procedure should be followed EACH TIME a letter is needed," and that "[w]hen an established procedure or process does not cover the specific need, client teams should engage Contract Management." The Letters Policy admonished that, in this event, BofA client teams should not "draft their own letters."

98.93.  The Letters Policy's requirement that letters "must be related to an identifiable purpose" required that BofA issue a letter only if it was aware of the letter's "purpose."

99.94.  The Letters Policy's requirement that letters be "restricted to facts or information that the Bank is able to verify" required that BofA issue a letter only if it was able verify the information in the Letters by reviewing the Account records.

100.95.Aside from the factual falsehoods in the Letters – and perhaps because of the factual falsehood in the Letters – the contents and issuance of the Letters violated the Letters Policy, which shows that BofA was aware that the Letters were requested in connection with wrongful activity with respect to the Account.

101.96.Because the Letters violated the Letters Policy, they were not "a transaction in the ordinary course of business" and their issuance constituted conduct that was atypical or lacked business justification, thus allowing for an inference of knowledge by BofA.

**VII.    BofA Ignored and Failed to Disclose Material Information About the Trust Account**

102.97.BofA reviewed the account statements to prepare the letters and, in doing so, had knowledge of the unusual activity and large withdrawals from the Trust Account and knew that that activity was not consistent with a trust account holding escrow funds, particularly given its knowledge of the Escrow Agreements Wright Brothers entered into with Plaintiffs.

103.98.In particular, BofA's knowledge about Wright Brothers' business and role as an escrow agent, along with the nature of the Trust Account and the deposits made to that account, meant that BofA knew that the account's activity was unusual and suspicious. Indeed, in some instances, the monies were transferred out of the Trust Account on the same day they were deposited, an event flatly inconsistent with the nature of the account as known to BofA. And often, the amounts were paid out in a manner also flatly at odds with the fact the monies paid into the accounts were deposits to be held in escrow pending the consummation of an aviation transaction.

104.99.BofA is a sophisticated national bank that routinely sets up, maintains, and monitors escrow and trust accounts, and thus knew that the withdrawals from the Trust Account were not consistent with the nature of escrowed deposit funds in the aviation industry and, specifically, Wright Brothers' business of providing escrow services to Plaintiffs. Yet BofA failed to disclose such information concerning the activity of the Trust account and Plaintiffs were harmed by BofA's omission.

105.100.      BofA knew that the Trust Account held escrow funds. As a result of its sophisticated monitoring system, BofA knew that Wright Brothers was not treating the funds in the Trust Account as escrow funds would be treated as part of an aviation transaction. On the contrary, BofA knew that the funds were being disbursed to persons other than the depositors and were being disbursed in amounts different than the deposits, a clear indication that the escrow

funds were being misappropriated. For example, Wells Fargo sent BofA the "314(b) Information Sharing Request" concerning a potentially fraudulent $250,000 wire from Wright Brothers to a Wells Fargo customer by the name of Alfredo Barba Mariscal, asking BofA "what funded the [$250,000] wire issued by Wright Brothers Aircraft Title, Inc." BofA responded by identifying numerous entities, including "Chemtov Mortgage Group dba CMG," the manager of the CMG Plaintiffs. Yet, BofA knew that the escrow funds paid by the CMG entities were not to be paid to third parties such as Mariscal. They were to be returned to the depositing CMG entity. BofA thus knew that Wright Brothers was misappropriating the escrow funds in the Trust Account.

106.101.      In view of the knowledge on the part of BofA concerning the nature of the Trust Account, the nature of Wright Brothers business, and the misuse of Trust Account funds, the issuance of the Letters was atypical conduct lacking business justification and not done in the ordinary course of its business.

107.102.      BofA intentionally ignored, was willfully blind to, recklessly ignored, or failed to exercise reasonable care with regard to its knowledge of activity in the Trust Account that it knew was irregular and suspicious activity, that it had to review to send the letters it issued, and not consistent with the nature of the account, including through the use of suspicious activity alerts, in the course of its management of the Trust Account. As a result, BofA omitted material information in its representations about the Trust Account with respect to the activity in the account before, during, or after the provision of the Letters.

108.103.      Nor was this a matter of BofA failing to "investigate" suspicious activity. BofA had all of the facts.  BofA knew that (a) Wright Brothers was an aviation escrow agent, (b) Wright Brothers was providing escrow services to Plaintiffs, (c) the funds deposited in the Trust Account were escrow funds, (d) Wright Brothers thus owed Plaintiffs a fiduciary duty, (e)

withdrawals or transfers from the Account were to parties other than the Plaintiffs, in violation of aviation escrow agreements (including those with Plaintiffs), and in amounts different that the escrow amounts deposited into the Trust Account.  BofA thus had actual knowledge that Wright Brothers was misappropriating the escrow funds.

~~109.~~104.        Alternatively, BofA intentionally ignored and was willfully blind to these facts, all of which were in its possession and which reflected, at a minimum, a high probability that the escrow funds were being misappropriated.  Yet, BofA took deliberate action to avoid learning the facts, including when it reviewed the Trust Account data when it wrote the Letters.

## VIII.   In Reliance on BofA's False and Misleading Letters, Plaintiffs Deposited Funds into the Trust Account and Were Thereby Defrauded

~~110.~~105.        BofA knew or had reason to know that the Letters and the information in them would be provided, directly or indirectly, to third parties to solicit business for Wright Brothers. Thus, BofA intended that the Letters and the information in them, in addition to the fact that BofA was vouching for Wright Brothers, would be communicated, directly or indirectly, to third parties such as Plaintiffs. In so doing, BofA intended that potential depositors, including Plaintiffs, would rely upon the letters themselves as BofA's stamp of approval to conduct business with Wright Brothers. Further, BofA necessarily intended that potential depositors, like Plaintiffs, would rely upon all the information contained within those letters when deciding to entrust their deposits to Wright Brothers' BofA accounts.

~~111.~~106.        Moreover, Moncler also had a 30-year professional relationship with BofA and enjoyed friendly and familiar professional relationships with several high-level officials within BofA's private banking organization. Because of this long-standing relationship, in or about 2016, and prior to deciding to conduct commercial aircraft transactions with Wright Brothers and Mercer-Erwin, Moncler inquired with one particular high-level official in BofA's

private banking organization as to BofA's relationship with Wright Brothers. A few days after the inquiry, the high-level official responded that Wright Brothers and Mercer-Erwin were longtime clients in good-standing, that they maintained substantial deposits at BofA's bank, and that Wright Brothers and Mercer-Erwin enjoyed an excellent reputation at BofA's bank. Following these assurances, Moncler agreed to conduct commercial aircraft transactions with Wright Brothers which entailed depositing substantial sums in the Trust Account.

112.107.     In another instance, this one in 2016, CMG communicated with BofA to confirm the information contained in one of the Letters and, in response, BofA confirmed the information but omitted disclosure of material information concerning the activity in the Trust Account, which information was required to render the letter not misleading.

113.108.     Plaintiffs reasonably relied on the fact of BofA's Letters as well as the false and misleading statements and assurances contained within BofA's Letters when Plaintiffs entered into the Escrow Agreements with Wright Brothers and deposited funds into the Trust Account. Plaintiffs would not have made the payments into the Trust Account but for being provided or otherwise being informed of BofA's issuance of the Letters.

114.109.     BofA played a critical role in perpetuating and facilitating a wide-spread scheme to defraud Plaintiffs and to steal at least $167 million from Plaintiffs, while itself profiting from its own misconduct. All of the acts taken by BofA's employees alleged herein were taken within the course and scope of their employment and with apparent authority.

**FIRST CAUSE OF ACTION**
**FRAUDULENT MISREPRESENTATION**

115.110.     Plaintiffs incorporate the allegations in paragraphs 1 through 114 above as though fully set forth herein.

116.111.     Through its Letters, BofA knowingly and directly or indirectly made to Plaintiffs material representations of existing fact that were false and, further, knowingly omitted disclosing material information required to make its disclosure of facts to Plaintiffs complete, accurate, and not misleading.

117.112.     BofA also knowingly omitted from each of the Letters material information, including about activity in the Trust Account such as payments that BofA knew were in respect of timing and payees inconsistent with the Trust Account, which information was material to make its representations not misleading.

118.113.     BofA intended – and caused – its Letters and the information in them to be widely provided, directly or indirectly, to parties, including Plaintiffs, that were potential depositors in the Trust Account as a result of entering into escrow agreements with Wright Brothers. BofA intended – and caused – its Letters to make representations that would reasonably cause Trust Account depositors, including Plaintiffs, to believe that Wright Brothers could be trusted to safeguard large sums of money placed in the Trust Account. To the extent BofA maintains the account was not a Trust Account, it misrepresented the nature of the account by allowing the account to be labeled as such and by referring to the account as a Trust Account in at least one of the Letters. And BofA intended that its Letters would reasonably cause direct or indirect third-party recipients, including Plaintiffs, to rely upon BofA's "Letter of Reference" as BofA's recommendation of Wright Brothers as a trustworthy custodian of funds deposited into the Trust Account.

119.114.     Applicable banking regulations, as well as BofA's own internal policies and procedures, required BofA to conduct due diligence on a customer and its accounts before drafting letters including information about that customer and its accounts.

120.115.　　　Applicable banking regulations, as well as BofA's own internal policies and procedures, required BofA to review the actual balances in Wright Brothers' accounts before drafting letters that included specific representations about the account balances.

121.116.　　　BofA complied with its internal and external obligations and, as such, BofA knew or should have known the information stated in the Letters was false and inaccurate or was otherwise rendered misleading by virtue of omissions of other material information.

122.117.　　　Alternatively, if BofA did not comply with the obligations to review the actual account balances and the nature of the transactions in the account before making representations about those balances and transactions, BofA was willfully blind or reckless in making the representations and omissions.

123.118.　　　BofA's Letters, as well as the false and misleading representations therein and omissions therefrom, were material and issued with the intent that potential Trust Account depositors, including Plaintiffs, would consider and rely upon them. BofA intended that third parties would rely – and Plaintiffs did in fact rely – upon BofA's provision of the Letters and the contents therein, including BofA vouching for Wright Brothers as a good business partner that had not engaged in any suspicious activity, the account balances, the dollar amounts of the transactions in Wright Brothers' accounts, and BofA's assurances that those transactions were indeed "aviation transactions."

124.119.　　　As a direct and proximate result of BofA's fraud, Plaintiffs sustained actual damages in an amount in excess of $167 million.

## SECOND CAUSE OF ACTION
## AIDING AND ABETTING FRAUD

125.120.　　　Plaintiffs incorporate the allegations in paragraphs 1 through 114 above as though fully set forth herein.

126.121.    Wright Brothers opened and labeled the bank account at Bank of America a "trust account," and BofA titled and described the account as a "trust account" in bank statements.

127.122.    The Perpetrators induced Plaintiffs to deposit funds into the Wright Brothers Trust Account based on the materially false statements and material omissions in the Letters. In reliance upon those misrepresentations and omissions, Plaintiffs deposited their money in the Trust Account maintained by BofA. Notwithstanding the terms of Plaintiffs' Escrow Agreements, Plaintiffs' fully refundable deposits were not returned to them when the agreed upon conditions of the aircraft purchase transactions were not completed by the required dates. Instead, Plaintiffs' refundable deposits were wrongfully withdrawn from the Trust Account and diverted to the Perpetrators for their own purposes, including to "compensate" Wright Brothers for its participation in the Ponzi scheme.

128.123.    In order to comply with its obligations under the BSA, including the "Know Your Client" requirements, BofA implemented programs that detect suspicious activity, as defined by the BSA and other pertinent statutes. Suspicious activity also must be reported to the appropriate authority and reporting protocols must be clearly documented and disseminated throughout BofA's organization, meaning that BofA had knowledge and a duty to report such activity. BofA is also required to make clear to all employees that everyone in the organization must play a role in maintaining compliance.

129.124.    BofA, a sophisticated national bank that routinely sets up, maintains, and monitors escrow and trust accounts, and which must comply with its obligations under the BSA, thus had information that the Perpetrators' withdrawals from the Trust Account were, at a minimum, irregular and suspicious and inconsistent with the nature of the transactions in which

Plaintiffs engaged with Wright Brothers. BofA thus had actual knowledge of that Wright Brothers was misusing the escrow funds in the Trust Account.

130.125.    BofA is also obligated, according to its own Letters Policy, to include only facts and information that can be verified. Accordingly, BofA had to have reviewed the Trust Account statements and activity to be able to draft the Letters or it deliberately declined to review the information in its possession. In either case, whether BofA saw the unusual Trust Account activity and drafted materially false Letters or failed to review the activity and blindly issued the Letters, BofA is properly charged with knowledge of the suspicious activity.

131.126.    Additionally, and assuming BofA's assertions concerning the nature of the account are correct, in reviewing the Trust Account statements, BofA would have had to note that the account—though labeled a Trust Account—was, in fact, a demand deposit account. Therefore, even if its status as a demand deposit account made the volume of deposits and withdrawals somehow unremarkable, the false "Trust Account" must have been deliberately ignored by BofA staff, who are familiar with the proper labeling and functioning of trust accounts.

132.127.    Stated differently, BofA purposefully ignored this information in its possession and was thus willfully blind as to the fraudulent activity because the information in its possession disclosed the high likelihood of wrongdoing in connection with the Trust Account.

133.128.    BofA took the affirmative step of drafting the account verification letters and then providing those letters to Wright Brothers, knowing that Wright Brothers would supply the letters to third parties to be used to persuade Trust Account Depositors, like Plaintiffs, to deposit funds into the Trust Account.

134.129.      Because BofA wrote letters about the account activity—repeated letters—it clearly had to look at the activity in the account. To then not note the withdrawals on the same day as funds were deposited, and other activity inconsistent with an escrow account was to be willfully blind, which must be treated as equivalent to knowledge.

135.130.      The account statements showed that the withdrawals and transfers from the Trust Account were in violation of the escrow agreements between Wright Brothers and Plaintiffs because the funds were transferred to persons other than depositors in the Trust Account and in amounts different than those deposited by the depositors, including Plaintiffs, which BofA knew violated the terms of Wright Brothers' escrow agreements and escrow agreements in aviation transactions generally.

136.131.      The provision of the Letters to Wright Brothers was not a typical banking activity. While BofA may issue reference letters, the letters are subject to stringent criteria and requirements, including that: they be "accurate" and "be restricted to facts or information that the Bank is able to verify"; they *not* contain "opinions or other subjective assessments," such as that the "client is reliable, able to complete a transaction, or has any particular expertise of capability"; and they never be addressed to "To Whom It May Concern." The Letters violated every one of these proscriptions and were anything but "typical banking activity." The Letters also lacked a business justification. There is no legitimate business justification for issuing Letters that contain false statements.

137.132.      BofA knowingly and substantially assisted, enabled, and facilitated the commission of Wright Brothers' fraud by providing, at least, nine separate letters over a five-year span, specifically targeted to persuade Trust Account Depositors, like Plaintiffs, to deposit their funds into the Trust Account.

138.133.      BofA knowingly and substantially assisted, enabled and facilitated the commission of the Perpetrators' fraud by failing to adhere to international, federal, local and internal regulatory banking procedures and policies.

139.134.      BofA substantially assisted, enabled and facilitated the Perpetrators' fraud through its willful blindness to the pattern of suspicious activity in connection with the Trust Account.

140.135.      BofA should have suspended or terminated the Trust Account based on the activity in the Trust Account or refrained from providing the false and misleading Letters, or provided Letters that were truthful and complete. Had BofA done so, Plaintiffs would not have deposited their funds in the Wright Brothers Trust Account and had their money stolen.

141.136.      BofA's conduct caused Plaintiffs actual damages in excess of $167 million.

**THIRD CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

142.137.      Plaintiffs incorporate the allegations in paragraphs 1 through 114 above as though fully set forth herein.

143.138.      A fiduciary relationship existed between Wright Brothers and Plaintiffs, as parties to the Escrow Agreements.

144.139.      As the escrow agent, Wright Brothers owed fiduciary duties to Plaintiffs and was only permitted to act in accordance with the terms of the Escrow Agreements and in the best interests of Plaintiffs.

145.140.      Wright Brothers breached its fiduciary duties by removing Plaintiffs' fully refundable deposits from the Trust Account, in direct violation of the terms of the Escrow Agreements.

146.141.     Wright Brothers breached its fiduciary duties by not acting in Plaintiffs' best interests when Wright Brothers diverted Plaintiffs' Escrow Funds to Machado or Machado-designated entities.

147.142.     The Trust Account was labeled and described as a trust account at BofA's bank. BofA knew that Wright Brothers owed a fiduciary duty to the Trust Account Depositors, and BofA's bank would have required and maintained the related escrow agreements as part of its procedures when opening an escrow and trust account.

148.143.     If BofA complied with its legal obligations under the BSA, BofA would have detected and been aware of the suspicious activity in the Trust Account over, at a minimum, a five- year period, through its automated account monitoring systems evidencing Wright Brothers' breach of its fiduciary duties owed to Plaintiffs.

149.144.     If BofA had detected and reported the suspicious activity in the Trust Account, according to its obligations under the BSA, the Trust Account would have been suspended or terminated before Plaintiffs engaged in the subject transactions, including before they made deposits into the Trust Account.

150.145.     As alleged above in paragraphs 42 and 43, BofA had actual knowledge of Wright Brothers' breach of fiduciary duties owed to Plaintiffs.

151.146.     Further, as alleged in paragraphs 45 through 52, BofA had strict policies which should have caused it to make reasonable inquiries into the suspicious activity which clearly showed Wright Brothers' breach of its fiduciary duties to Plaintiffs.  As a result, BofA was willfully blind as to Wright Brothers' breach of fiduciary duties by intentionally failing to make reasonable inquiries, as required by the BSA, when faced with the suspicion or awareness of the high likelihood of wrongdoing in connection with the Trust Account.

~~152.~~147.      BofA knowingly and substantially assisted, enabled, and facilitated the Wright Brothers' breach of fiduciary duties owed to Plaintiffs by providing, at least, nine separate letters over a five-year span, specifically targeted to persuade Trust Account Depositors, like Plaintiffs, to deposit their funds in the Trust Account.

~~153.~~148.      BofA knowingly and substantially assisted, enabled, and facilitated Wright Brothers' breach of fiduciary duties owed to Plaintiffs by failing to adhere to international, federal, local, and internal regulatory banking procedures and policies.

~~154.~~149.      BofA substantially assisted, enabled, and facilitated Wright Brothers' breach of fiduciary duties owed to Plaintiffs through its willful blindness to the pattern of suspicious activity in connection with the Trust Account.

~~155.~~150.      BofA's conduct caused Plaintiffs actual damages in excess of $167 million.

**FOURTH CAUSE OF ACTION**
**AIDING AND ABETTING CONVERSION**

~~156.~~151.      Plaintiffs incorporate the allegations in paragraphs 1 through 114 above as though fully set forth herein.

~~157.~~152.      The Trust Account was opened, labeled, and described as a trust account by BofA. BofA knew that the Trust Account held funds belonging to Plaintiffs or depositors like Plaintiffs.

~~158.~~153.      From its review of the account statements and account activity that it conducted in connection with the Letters, BofA knew that Wright Brothers was converting funds belonging to others, including Plaintiffs.

~~159.~~154.      BofA also detected and was aware of the suspicious activity in the Trust Account over, at a minimum, a four-year period, through its policies and procedures, including

its anti-money laundering compliance program and its automated account monitoring systems, further evidencing BofA's knowledge that Wright Brothers was converting funds belonging to depositors in the Trust Account, including Plaintiffs.

160.155.     Thus, BofA had actual knowledge of Wright Brothers' conversion of Plaintiffs' funds.

161.156.     In the alternative, BofA was willfully blind as to Wright Brothers' conversion by intentionally ignoring information in its possession when faced with circumstances that showed a high likelihood of wrongdoing in connection with the Trust Account, and notwithstanding that BofA took the affirmative step of issuing the Letters and then providing them to Wright Brothers knowing that Wright Brothers would, in turn, supply to, or use with respect to, third parties such as Plaintiffs to persuade them to deposit their funds in the Trust Account.

162.157.     Bank of America knowingly and substantially assisted, enabled, and facilitated Wright Brothers' conversion by providing, at least, nine separate letters over a four-year span, specifically targeted to persuade Trust Account Depositors, like Plaintiff, to deposit their funds in the Trust Account.

163.158.     Bank of America should have suspended or terminated the Trust Account based on the activity occurring in the account, or, at a minimum, Bank of America should have refrained from providing materially false and misleading Comfort Letters and Balance Verification Letters with respect to Wright Brothers and the Trust Account and should have included all material information that was omitted. Had Bank of America done any of those things, then Plaintiff would not have deposited its funds in the Bank of America Trust Account, and the money would not have been stolen.

164.159.    Bank of America knowingly and substantially assisted, enabled, and facilitated Wright Brothers' conversion of Plaintiff's monies by, among other things, (i) failing to adhere to international, federal, local, and internal regulatory banking procedures and policies, (ii) by failing to prevent the misappropriation and theft of Plaintiff's funds deposited into the Trust Account, and (iii) by providing the Comfort Letters and the Balance Verification Letters (that it knew or was willfully blind to the fact were materially false and omitted material information).

165.160.    In addition, Bank of America substantially assisted, enabled, and facilitated Wright Brothers' conversion through its willful blindness to the pattern of suspicious activity in connection with the Trust Account.

166.161.    Bank of America played a critical role in allowing the Fraudsters to perpetrate and perpetuate a wide-spread scheme to defraud Plaintiff and convert its monies while profiting from its own misconduct.

167.162.    Bank of America's conduct described herein caused Plaintiff actual damages in an amount to be proven at trial, but which are in excess of $167,000,000.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

168.163.    Plaintiffs incorporate the allegations in paragraphs 1 through 114 above as though fully set forth herein.

169.164.    In the Letters, BofA directly or indirectly made to Plaintiffs material representations of facts that were false and omitted material information required to make its disclosures to Plaintiffs complete, accurate and not misleading.

170.165.    BofA also knowingly omitted from each of the Letters material information, including about activity in the Trust Account such as payments that BofA knew

were inconsistent with the Trust Account (in respect of timing and payees), which information was material to make its representations accurate, true, and not misleading.

171.166.      BofA's Letters were intended by BofA to be – and were, in fact – widely provided, directly or indirectly, to potential Trust Account Depositors, including Plaintiffs. BofA's letters intended to – and did – make representations that reasonably caused the Plaintiffs to believe that Wright Brothers could be trusted to safeguard large sums of money placed in the Trust Account.

172.167.      Applicable banking regulations, as well as BofA's own internal policies and procedures, required BofA to conduct due diligence on a customer and its accounts before drafting letters including information about that customer and its accounts.

173.168.      Applicable banking regulations, as well as BofA's own internal policies and procedures, required BofA to review the actual balances in Wright Brothers' accounts before drafting letters that included specific representations about the account balances.

174.169.      BofA complied with its internal and external obligations and, as such, BofA knew or should have known the information in the Letters was false and inaccurate or was otherwise rendered misleading by virtue of omissions of material information.

175.170.      Alternatively, if BofA did not comply with the obligations to review the actual account balances and the nature of the transactions in the account before making representations about those balances and transactions, BofA was willfully blind or reckless in making the representations and omissions.

176.171.      BofA's false and misleading representations were material and issued with the intent that potential Trust Account depositors, including Plaintiffs, would consider and rely upon the information contained in the Letters, in addition to relying on BofA's vouching for

Wright Brothers. Plaintiffs relied upon BofA's provision of the Letters and the contents thereof, including the balance and transaction amounts, BofA's assurances that those amounts related to aviation transactions, and BofA's vouching for Wright Brothers as a trustworthy business partner that would appropriately safeguard the funds deposited into the Trust Account.

177.172.    BofA's false and misleading representations were material and issued with the intent that Plaintiffs would consider and rely upon the information. Plaintiffs relied upon BofA's provision of the Letters, the information in the Letters, and BofA's vouching for Wright Brothers to make payments into the Trust Account.

178.173.    As a direct and proximate result of BofA's misrepresentations and omissions, Plaintiffs sustained actual damages in an amount in excess of $167 million.

## SIXTH CAUSE OF ACTION
## VIOLATION OF SECTION 552, RESTATEMENT (TORTS) SECOND

179.174.    Plaintiffs incorporate the allegations in paragraphs 1 through 114 above as though fully set forth herein.

180.175.    In the Letters, BofA directly or indirectly made to Plaintiffs material representations of facts that were false and omitted material information required to make its disclosures to Plaintiffs complete, accurate and not misleading.

181.176.    BofA also knowingly omitted from each of the Letters material information, including about activity in the Trust Account such as payments that BofA knew were inconsistent with the Trust Account (in respect of timing and payees), which information was material to make its representations accurate, true, and not misleading.

182.177.    BofA's Letters were intended by BofA to be – and were, in fact – widely provided, directly or indirectly, to potential Trust Account Depositors, including Plaintiffs. BofA's letters intended to – and did – make representations that reasonably caused the Plaintiffs

to believe that Wright Brothers could be trusted to safeguard large sums of money placed in the Trust Account.

183.178.    Applicable banking regulations, as well as BofA's own internal policies and procedures, required BofA to conduct due diligence on a customer and its accounts before drafting letters including information about that customer and its accounts.

184.179.    Applicable banking regulations, as well as BofA's own internal policies and procedures, required BofA to review the actual balances in Wright Brothers' accounts before drafting letters that included specific representations about the account balances.

185.180.    BofA complied with its internal and external obligations and, as such, BofA knew or should have known the information in the Letters was false and inaccurate or was otherwise rendered misleading by virtue of omissions of material information.

186.181.    Alternatively, if BofA did not comply with the obligations to review the actual account balances and the nature of the transactions in the account before making representations about those balances and transactions, BofA was willfully blind or reckless in making the representations and omissions.

187.182.    BofA's false and misleading representations were material and issued with the intent that potential Trust Account depositors, including Plaintiffs, would consider and rely upon the information contained in the Letters, in addition to relying on BofA's vouching for Wright Brothers. Plaintiffs relied upon BofA's provision of the Letters and the contents thereof, including the balance and transaction amounts, BofA's assurances that those amounts related to aviation transactions, and BofA's vouching for Wright Brothers as a trustworthy business partner that would appropriately safeguard the funds deposited into the Trust Account.

~~188.~~183.      BofA's false and misleading representations were material and issued with the intent that Plaintiffs would consider and rely upon the information. Plaintiffs relied upon BofA's provision of the Letters, the information in the Letters, and BofA's vouching for Wright Brothers to make payments into the Trust Account.

~~189.~~184.      BofA in the course of its business and in connection with transactions in which it had a pecuniary interest supplied false information for the guidance of Plaintiffs, whom BofA intended would rely upon the guidance in their business transactions with Wright Brothers. In doing so, BofA failed to exercise reasonable care or competence in communicating the information.

~~190.~~185.      As a direct and proximate result of BofA's breach of duty, Plaintiffs sustained actual damages in an amount in excess of $167 million.

<u>**SEVENTH CAUSE OF ACTION**</u>
<u>**NEGLIGENCE**</u>

~~191.~~186.      Plaintiffs incorporate the allegations in paragraphs 1 through 114 above as though fully set forth herein.

~~192.~~187.      A fiduciary relationship existed between Wright Brothers and Plaintiffs, as parties to the Escrow Agreements.

~~193.~~188.      The Trust Account was labeled and described as a "Trust Account" at Bank of America and on bank statements and was referred to as an escrow account in at least one of the Letters.

~~194.~~189.      BofA owed a duty to Plaintiffs because

        a.  it knew that Wright Brothers was a fiduciary of Plaintiffs, by virtue of Wright Brothers' use of the title of "Trust Account" and its

familiarity with the logistics of aviation transactions, as well as the basic functions of an aircraft title company;

b. it knew, or should have known, that Wright Brothers was misappropriating the funds in the Trust Account, as it possessed and reviewed the Trust Account statements which reflected huge deposits and withdrawals which were inconsistent with the activity of a genuine trust account;

c. it was a party to a transaction (the deposit of Plaintiffs' funds in the Trust Account) who decided to speak and had specifical knowledge of material facts to which Plaintiffs did not have access. BofA knew or should have known that Wright Brothers, one of the Perpetrators of the fraud, intended to provide the Letters to Plaintiffs or otherwise provide Plaintiffs with information contained in the Letters. As foreseeable recipients of the information provided in the comfort and balance verification letters, BofA owed a duty to Plaintiffs to provide only accurate and complete information.

195.190.    Pursuant to its internal policies, BofA is responsible for taking measures to ensure that Wright Brothers, and other customers, are not engaged in any suspicious banking activity and to conduct appropriate due diligence on its customers and their accounts. BofA is obligated to consider the type of account, and its size, the pattern of activity, including types and frequency of transactions, among other factors, to assess risks.

196.191.      Trust accounts formed in private banking departments, like the Trust Account, is a recognized scenario where enhanced due diligence is appropriate.

197.192.      BofA maintained the Trust Account for Wright Brothers for almost 20 years and was familiar with the typical pattern of activity.

198.193.      Because trust accounts are designed to safeguard deposits until certain conditions are fulfilled, BofA knew or should have known that Plaintiffs' Escrow Funds deposited in the Trust Account could not be withdrawn unless or until the conditions precedent set forth in the escrow agreement had been met.

199.194.      BofA knew or should have known that the Escrow Funds were to be returned to Plaintiffs upon the occurrence of a condition precedent.

200.195.      Plaintiffs, as depositors to the Trust Account, were foreseeably impacted by the withdrawal of funds from the Trust Account.

201.196.      BofA owed a duty to Plaintiffs to exercise the reasonable and ordinary care of competent bank officers in managing and supervising the Trust Account.

202.197.      BofA failed to undertake the recommended enhanced due diligence for a trust account and failed to monitor for suspicious activity.

203.198.      BofA breached its duty to Plaintiffs by failing to monitor the numerous withdrawals from the Trust Account and by failing to alert Plaintiffs to the atypical and suspicious activities in the Trust Account.

204.199.      As a direct and proximate result of BofA's negligence, Plaintiffs sustained actual damages in an amount in excess of $167 million.

WHEREFORE, Plaintiffs demand as follows:

A.      A judgment awarding damages of at least $167,875,000, plus interest.

      B.      Leave to seek punitive damages, in addition to actual damages, in an amount sufficient to make an example of and to punish BofA.

      C.      A judgment awarding Plaintiffs their attorneys' fees as permitted by law.

      D.      A judgment awarding Plaintiffs their costs and disbursements as permitted by law.

      E.      A judgment awarding Plaintiffs such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: ~~October 23, 2023~~March 29, 2024         Respectfully submitted,

                                      BOIES SCHILLER FLEXNER LLP

                                    By: */s/ Stuart H. Singer*
                                        Stuart H. Singer, Esq.
                                        Fla. Bar No. 377325
                                        Carlos M. Sires, Esq.
                                        Fla. Bar No. 319333
                                        Jesse Panuccio
                                        Fla. Bar. No. 031401
                                        Ana Carolina Varela
                                        Fla. Bar No. 123069
                                        401 East Las Olas Blvd., Suite 1200
                                        Fort Lauderdale, Florida 33301
                                        Telephone: (954) 356-0011
                                        Facsimile:  (954) 356-0022
                                        Email: ssinger@bsfllp.com
                                        Email: csires@bsfllp.com
                                        Email: jpanuccio@bsfllp.com
                                        Email: avarela@bsfllp.com

                                      John J. Kucera, Esq.
                                      CA Bar No. 274184
                                      2029 Century Park East, Suite 1520
                                      Los Angeles, CA 90067
                                      Telephone: (213) 629-9040
                                      Facsimile:  (213) 629-9022
                                      Email: jkucera@bsfllp.com

*Attorneys for Plaintiffs*