UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   22-CV-80980-BER
22-CV-22541-BER

RUSTY 115 CORP., et. al,

Plaintiffs,

vs.

BANK OF AMERICA, N.A.,

Defendant.

_____/

## ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT (ECF No. 148/48)

Plaintiffs are 22 victims of a Ponzi scheme. The fraudsters used an account at Bank of America ("BOA" or "BofA") in furtherance of their scheme. Plaintiffs sued BOA for allegedly misrepresenting that the fraudsters were legitimate and otherwise helping further the fraud.[1]

The original Complaint contained causes of action for actual and constructive fraud, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, negligent misrepresentation, negligence under §552 of the Restatement (Second) of Torts, and common law negligence. ECF No. 1-2. BOA moved to dismiss the Complaint. ECF No. 24. I granted the motion in part. ECF No. 45. I dismissed Plaintiffs' claims for actual and constructive fraud, aiding and abetting fraud, aiding

---

[1] A different victim, Metrocity Holdings, LLC, filed a separate lawsuit against BOA. The two cases are consolidated for discovery. ECF No. 42.

and abetting breach of fiduciary duty, and common law negligence. Their claims for negligent misrepresentation and negligence under §552 of the Restatement of Torts, survived. BOA filed an Answer on those two claims. ECF No. 46.

Plaintiffs now ask for leave to file a First Amended Complaint (the "Proposed Amended Complaint") alleging fraudulent misrepresentation, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, aiding and abetting conversion, negligent misrepresentation, negligence under §552 of the Restatement (Second) of Torts, and common law negligence. ECF No. 48.[2] BOA objects on procedural and substantive grounds. ECF No. 52.[3]

After the Motion was fully briefed, I *sua sponte* questioned whether all plaintiffs had pled Article III standing. ECF No. 50, 56. The parties filed supplemental briefs on that issue. ECF Nos. 62, 66, 72. In their filing, Plaintiffs proffered additional facts that they also included in a revised Proposed Amended Complaint. ECF Nos. 62-1, 64-1. For purposes of the pending Motion, I will treat this supplemented Proposed Amended Complaint as the operative pleading.

I have reviewed the Motion for Leave to Amend, the Response (ECF No. 52), the Reply (ECF No. 53), and the supplemental filings. I also heard oral argument.

---

[2] Citations to "ECF No." refer to the docket in case number 22-22541. Citations to "MC ECF No." refer to the docket in *Metrocity Holdings, LLC, et. al. v. Bank of America,* case no. 22-cv-80980-BER.

[3] In its Response to the Motion for Leave to Amend, BOA challenges whether the Proposed Amended Complaint states a claim for negligent misrepresentation and negligence under Restatement §552. I decline to reconsider my prior ruling that, for purposes of a motion to dismiss, these counts state a claim upon which relief can be granted. As discussed more fully below, however, these counts must be dismissed as to Plaintiff Moncler Motors, LLC, for lack of Article III standing.

ECF No. 55. I am fully advised and this matter is ripe for decision. For the following reasons, the Motion for Leave to Amend is DENIED.

## I. LEGAL STANDARDS

### A. *Article III Standing*

Article III standing is a prerequisite to the Court exercising subject matter jurisdiction. "Article III standing 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong,' *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). It 'is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.'" *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc) (citation omitted). Without Article III standing, there is no constitutionally-cognizable case or controversy. A Court that lacks subject matter jurisdiction is without power to act. The party invoking the jurisdiction of a federal court bears the burden of establishing these elements to the extent required at each stage of the litigation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

"This case-or-controversy requirement comprises three familiar 'strands': (1) standing, (2) ripeness, and (3) mootness." *Gardner v. Mutz*, 962 F.3d 1329, 1336 (11th Cir. 2020) (citations omitted). In turn, there are three elements to establish Article III standing. There must be an injury-in-fact, a causal connection between the plaintiff's injury and the challenged action of the defendant (often called "traceability"), and a likelihood that a favorable judgement will redress the plaintiff's injury. *Id*. at 1338.

### B. Leave to Amend

Under Federal Rule of Civil Procedure 15(a), a plaintiff may amend a complaint once as a matter of course within certain time constraints. Fed. R. Civ. P. 15(a)(1). After this time has passed, a plaintiff may amend the complaint only with the opposing party's consent or leave of court. Fed. R. Civ. P. 15(a)(2). Rule 15 directs that "court[s] should freely give leave [to amend] when justice so requires." *Id.* "However, where a party's motion to amend is filed after the deadline for such motions, as delineated in the court's scheduling order, the party must show good cause why leave to amend the complaint should be granted." *Balthazar Mgmt. v. Beale St. Blues Co., Inc.*, No. 17-CV-81214, 2018 WL 8220563, at *2 (S.D. Fla. July 17, 2018) (quoting *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1366 (11th Cir. 2007)). The Court will not consider whether amendment is proper under Rule 15(a) until the moving party has demonstrated good cause to modify the scheduling order. *Sosa v. Airport Sys., Inc.*, 133 F. 3d 1417, 1419 (11th Cir. 1998). Good cause exists when "evidence supporting the proposed amendment would not have been discovered in the exercise of reasonable diligence until after the amendment deadline had passed." *Sporting Products, LLC v. Pacific Ins. Co., Ltd.*, No. 10-80656-CIV, 2011 WL 13225271, at *2 (S.D. Fla. June 21, 2011) (citing *Forstmann v. Culp*, 114 F.R.D. 83, 85-86 (M.D.N.C. 1987)).

Even if a request to amend a complaint is timely, the Court should not grant leave if amendment would be futile. "Leave to amend would be futile if an amended complaint would still fail at the motion-to-dismiss or summary-judgment stage."

*Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) *cited in L.S. ex rel. Hernandez v. Peterson,* 982 F.3d 1323, 1332 (11th Cir. 2020).

### C.  Failure to State a Claim

To survive a motion to dismiss for failure to state a claim, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal,* 556 U. S. 662, 678 (2009) (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). At the motion-to-dismiss phase, the Court must view the well-pled factual allegations in a claim in the light most favorable to the non-moving party. *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Viewed in that manner, the factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the claim are true (even if doubtful in fact). *Twombly*, 550 U. S. at 555 (citations omitted). In addition, "courts may infer from factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct that plaintiff would ask the court to infer." *Am. Dental Assoc. v. Cigna Corp.*, 605 F. 3d 1283, 1290 (11th Cir. 2010) (citing *Iqbal,* 556 U. S. at 682). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* 556 U. S. at 678 (quoting *Twombly,* 550 U. S. at 557). When evaluating a motion to dismiss under Rule 12(b)(6):

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal,* 556 U. S. at 679.

## II. WELL-PLED FACTS ALLEGED IN PROPOSED AMENDED COMPLAINT

### A. *Plaintiffs*

Plaintiffs comprise 22 separate corporate entities. Subsets of the plaintiffs are under common control:

- The "CMG Plaintiffs" are: CMG 777Escrow3, LLC; CMG 777 Escrow4 LLC; CMG 777Escrow5, LLC; and CMG DHC8Escrow7, LLC.

- The "Rusty Plaintiffs" are: Rusty115 Corp., Hopop Corp., DavidPop Corp., RustyPop Corp., and DaRusty Corp.

- The "Moncler Plaintiffs" are: Moncler Motors, LLC; BOE 25014, LLC; BOE 30868, LLC; BOE 30874, LLC; BOE 30875, LLC; BOE 34432, LLC; Dash 4542 LLC; Dash 4554 LLC; and Dash 4555 LLC.

- The "Bayside Plaintiff" is Bayside Support Services, LLC.

- The "CCUR/Edidin Plaintiffs" are: CCUR Holdings Inc.; CCUR Aviation Finance LLC; and Edidin Partners, LLC.

### B. Fraud Scheme

Wright Bros. Aviation Title ("Wright Bros.") was an aviation title company. ¶17.[4] Beginning in or before 2016, working with a third party named Federico Andres Machado, Wright Bros. operated a fraud scheme in which investors were lured to put money into a Wright Bros. bank account at BOA ("the Trust Account"). The investors were told that their money would be used to finance aviation transactions for third parties and that they would receive back more than their investment. In fact, the fraudsters stole the investors' money. Plaintiffs are some of the investors.

### C. Trust Account

Since at least 2002, Wright Bros. maintained the Trust Account which it used to hold escrow funds for the finance and purchase of aircraft. ¶¶40, 42. The signature card and bank statements for the Trust Account identify it as a "trust account." ¶40.

### D. Letters

Between August 2015 and August 2019, BOA issued numerous letters of reference ("the Letters") on behalf of Wright Bros. ¶¶57–76.

#### 1. August 20, 2015, Letter

On August 20, 2015, Brandon Ellis, a BOA Vice President and Business Banking Client Manager, issued a Letter addressed "To Whom It May Concern" that said:

> I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.

---

[4]Unless otherwise noted, paragraph citations ("¶") are to the numbered paragraphs of the Proposed Amended Complaint, ECF No. 62-1.

> Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 14 years. All of their accounts are in excellent standing. Wright Brothers Aviation Title has authorized me to tell you that over $380MM dollars in aviation transactions have passed through their accounts in the past 6 months, annualizing at over $760MM. We have never received a complaint having to do with the services they provide to their clients.

> If you have any additional questions regarding our relationship with this respected aviation title company, you may reach out to me directly.

¶¶57–58. The Rusty Plaintiffs received this letter between December 2017 and February 2018. ¶82(b). The Moncler Plaintiffs received it on December 28, 2017, from Machado. ¶82(c).

### 2. December 7, 2015, Letter

Approximately three months later, on December 7, 2015, Mr. Ellis issued a letter addressed "To Whom It May Concern" that said:

> I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.

> Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 14 years. All of their accounts are in good standing. Wright Brothers Aviation Title has authorized me to tell you that over $320MM dollars in aviation transactions have passed through their accounts in the past 6 months, annualizing at over $640MM.

> If you have any additional questions regarding our relationship with this respected aviation title company, you may reach out to me directly.

¶59. The CMG Plaintiffs received it on March 6, 2016, from Wright Brothers. ¶82(a).

### 3. July 5, 2016, Letter

Eight months later, on July 5, 2016, Mark Fish, a BOA Senior Vice President, issued a letter to the owner of Wright Bros. that said:

8

> Per your request, Wright Brothers Aircraft Title, Inc. has been a customer of Bank of America Merrill Lynch since October 18, 2001 and has maintained an aggregate average collected deposit balance of $11,818,006.50 over the past twelve months.

¶¶60–61. The "aggregate average collected deposit balance of $11,818,006.50" was calculated accurately based on the average ledger balances for the 12 months identified in the letter. ¶¶62–63.

### 4. January 11, 2017, Letter

Six months later, on January 11, 2017, Mr. Fish issued another letter to the owner of Wright Bros. that said:

> Per your request, Wright Brothers Aircraft Title, Inc. has maintained an aggregate average collected deposit balance of $11,648,172.00 over the past twelve months.

¶¶64–65. The "aggregate average collected deposit balance of $11,648,172.00" was calculated accurately based on the average ledger balances for the 12 months identified in the letter. ¶66.

### 5. April 27, 2017, Letter

Three months later, on April 27, 2017, Mr. Fish issued a Letter to the owner of Wright Bros. that said:

> Per your request, the total amount of all deposits made into the Wright Brothers Aircraft Title, Inc. escrow account in calendar year 2016 was $405,612,916.62.

¶¶67–68. The CMG Plaintiffs received this letter before they made their first deposit in November 2019. ¶82(a).

6.  <u>February 26, 2018, Letter</u>

On February 26, 2018, Elizabeth Haralson, a BOA Relationship Manager,

issued a letter to the owner of Wright Bros. that said:

> I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.
>
> Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 17 years. All of their accounts are in excellent standing. Wright Brothers Aviation Title has authorized me to tell you that their average volume over the last 6 months has been $183MM. We have never received a complaint having to do with the services they provide to their clients.
>
> If you have any additional questions regarding our relationship with this well respected aviation title company, you may reach out to me directly.

¶¶69–70. The CMG Plaintiffs received this letter on or about February 26, 2018, from

Machado. ¶82(a). The Rusty Plaintiffs received it on or about February 26, 2018, from

Wright Brothers. ¶82(b).

7.  <u>January 24, 2019, Letter</u>

Almost a year later, on January 24, 2019, Ms. Haralson issued a letter

addressed "To Whom It May Concern" that said:

> I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.
>
> Wright Brothers Aviation Title, Inc. has maintained a strong banking relationship with Bank of America and its predecessors for the past 18 years. All of their accounts are in excellent standing. Wright Brothers Aviation Title has authorized me to tell you that over $257 MM dollars in aviation transactions have passed through their account in the past 6 months, annualizing at over $515 MM. We have never received a complaint having to do with the services they provide to their clients.

> If you have any additional questions regarding our relationship with this well respected aviation title company, you may reach out to me directly.

¶¶71–72. The CMG Plaintiffs received this letter from Machado on or about January 24, 2019. ¶82(a).

### 8. March 1, 2019, Letter

On March 1, 2019, Ms. Haralson issued a Letter to the owner of Wright Bros. that said:

> Per your request, Wright Brothers Aircraft Title, Inc. has been a Bank of America customer since 10/2001 and has maintained an aggregate average collected balance of $25,700,936.26 over the past six months.

¶¶73–74.

### 9. August 9, 2019, Letter

Five months after that, on August 9, 2019, Ms. Haralson issued a letter to the owner of Wright Bros. that said:

> Per your request, Wright Brothers Aircraft Title, Inc. has been a Bank of America customer since 10/2001 and has maintained an average collected balance of $33,938,782.00 over the past six months.

¶¶75–76.

### E. Communications Among Plaintiffs About the Letters

In late 2017 and early 2018, the Bayside Plaintiffs spoke to the Moncler Plaintiffs about Wright Bros:

> In or about August 2017, in the course of conducting due diligence on Wright Brothers, the Bayside Plaintiff's representative was advised by a Moncler principal that BofA had issued letters in which it endorsed and recommended Wright Brothers. Specifically, he was advised that Moncler had received from an officer of BofA an endorsement of Wright Brothers, including that Wright Brothers and Mercer-Erwin were longtime clients in good standing, maintained substantial deposits at

11

the bank, and enjoyed an excellent reputation at the bank and that the bank had properly operated the Trust Account. In or about January 2018, Plaintiff Bayside's representative was advised by Plaintiff Moncler's representative of a letter issued by BofA, which letter was quoted in part and provided an endorsement and recommendation of Wright Brothers. In addition, prior to making the deposits at issue in this case, Machado repeatedly advised Plaintiff Bayside that other aircraft finance participants had confirmed the trustworthiness of Wright Brothers through BoA, including by way of the letters.

¶82(d).

The CCUR/Edidin Plaintiffs learned about the Letters from Machado:

No later than May 14, 2020, and before their first deposit into the Trust Account, [the CCUR/Edidin Plaintiffs] were advised by Machado that BofA had issued the letters, in which it vouched for Wright Brothers, including by providing financial information reflecting the favorable financial condition of the company, its strong relationship with BofA, and its good reputation in the aviation finance industry.

¶82(e).

F. *Communications with BOA about Wright Bros.*

The principal of the CMG entities spoke to Mr. Fish in 2016 and to Ms. Haralson in 2018 or 2019 "concerning the aircraft transactions, the bank's relationship with Wright Brothers, and the letters, and he advised them that he was depositing monies into the trust account to be held in escrow as deposits for aircraft transactions." ¶82(a).

"[I]n or about 2016, a principal of the Moncler Plaintiffs inquired of an officer at BofA as to the bank's relationship with Wright Brothers, during which he advised the officer of the nature of the transactions the Moncler entities were entering into with Wright Brothers. (*i.e.,* making escrow deposits). A few days later, the BofA officer responded to the Moncler representative's inquiry and advised him that Wright

Brothers and Mercer-Erwin were longtime clients in good standing, maintained substantial deposits at the bank, enjoyed an excellent reputation at the bank, and that the bank had properly operated the trust account." ¶82(c).

### G.  BOA Letters Policy

BOA has a "Formal Letters & Correspondence" policy (the "Letters Policy") of "detailed procedures" to "ensure" that letters sent by BOA "are suitable to the situation and follow appropriate protocols." ¶89. At the time the Letters were issued, the Letters Policy provided, among other things, that:

a.      "Customized letters must contain only objective facts, such as the length of the Bank's relationship with the client, average amounts maintained on deposit with the Bank, e.g., mid-six figure range, and amount of credit commitments."

b.      "Opinions or other subjective assessments, e.g., the client is reliable, able to complete a transaction, or has any particular expertise or capability, must be avoided."

c.      "A letter should never be addressed "To Whom It May Concern."

d.      Letters "cannot contain subjective value judgments or opinions about the customer, its ability to complete a proposed business transaction or other matters beyond the knowledge or control of the Bank."

e.      "All information in the letter must be accurate as of the date of the letter and be restricted to facts or information that the Bank is able to verify."

      f.        "The request [for the letters] must be related to an identifiable purpose, project/contract, or be trade related."

      g.       "Letters must be signed by an AVP or above."

¶90. The Letters Policy required that BOA issue a letter only if it was aware of the letter's purpose. ¶93. It also required that BOA issue a letter only if it was able verify the information in the letters by reviewing the account records. ¶94.

    *A. Escrow Agreements*

    Between November 2019 and November 2020, 21 Plaintiffs signed written Escrow Agreements with Wright Bros. ¶¶19–25. Moncler Motors, LLC, did not. *Id*.

    Under these agreements, the Rusty Plaintiffs put up substantial deposits, that were to be held in escrow, for the future purchase of aircraft by others. ¶16. Plaintiffs were supposed to receive the return of the deposits they advanced once these sales transactions were either consummated or cancelled; in exchange for putting up these deposits, Plaintiffs were paid interest or a fee. *Id*. The agreements specified that the deposits were to be held in the Trust Account at BOA. ¶¶16, 17. They identified Wright Bros. as "Escrow Agent" and each plaintiff as "Depositor." ¶26. They required Wright Bros. to "'hold, invest, and disburse all funds received from or on behalf of the Depositor' in accordance with the terms of the agreements [and to not] 'disburse the Escrow Funds or any portion thereof to any party other than the Depositor,' as is customary in aircraft transactions." *Id*.

    On an unspecified date, BOA "received at least one Escrow Agreement." ¶43(d). "The Escrow Agreement made clear that the funds deposited in the Trust Account

were deposits to be held in escrow by Wright Brothers and that the funds could not be disbursed to any party other than the depositor Plaintiff." *Id.*

   B. *Deposits*

   Between November 2019 and November 2020, 21 Plaintiffs deposited in excess of $167,000,000 into the Escrow Account, as follows:

| Date | Plaintiff | Amount |
|------|-----------|--------|
| 5/18/20 | DavidPop Corp. | $5,000,000 |
| 5/18/20 | HoPop Corp. | $5,000,000 |
| 11/12/20 | Rusty115 Corp. | $5,000,000 |
| 11/25/20 | DaRusty Corp. | $5,000,000 |
| 11/25/20 | RustyPop Corp. | $5,000,000 |
| 11/12/19 | CMG 777Escrow3, LLC | $15,000,000 |
| 11/14/19 | CMG 777Escrow3, LLC | $15,000,000 |
| 7/8/20 | CMG 777Escrow4 LLC | $10,000,000 |
| 8/5/20 | CMG 777Escrow5, LLC | $20,000,000 |
| 8/7/20 | CMG 777Escrow5, LLC | $10,000,000 |
| 9/1/20 | CMG DH8 Escrow7, LLC | $5,000,000 |
| 2/6/20 | BOE 30875, LLC | $4,000,000 |
| 4/16/20 | BOE 30874, LLC | $4,150,000 |
| 4/29/20 | BOE 30868, LLC | $3,950,000 |
| 5/18/20 | BOE 34432, LLC | $4,050,000 |
| 7/31/20 | Dash 4555 | $4,575,000 |

| 7/31/20 | Dash 4542 LLC | $4,575,000 |
|---------|---------------|------------|
| 7/31/20 | Dash 4554 LLC | $4,575,000 |
| 11/20/20 | BOE 25014, LLC | $3,000,000 |
| 7/6/20 | Bayside Support Services, LLC | $9,500,000 |
| 9/11/20 | Bayside Support Services, LLC | $9,500,000 |
| 5/14/20 | CCUR Holdings, Inc. | $5,000,000 |
| 11/13/20 | CCUR Aviation Finance LLC | $3,500,000 |
| 8/28/20 | CCUR Aviation Finance LLC | $5,000,000 |
| 11/27/20 | CCUR Aviation Finance LLC | $500,000 |
| 5/14/20 | Edidin Partners, LLC | $1,500,000 |
| 8/27/20 | Edidin Partners, LLC | $500,000 |

¶¶28–34. Moncler Motors did not make any deposits. *Id.*

When the operators of Wright Bros. were indicted in February 2021, Plaintiffs learned that their money had been diverted from the Trust Account for illicit purposes. ¶¶16, 35. Wright Bros. had disbursed funds to third parties in violation of the Escrow Agreements. ¶¶37, 38(c). Some of these disbursements occurred on the same day that funds came into the Trust Account. ¶37.

*C. Banking Policies*

Federal law, including the Bank Secrecy Act, requires BOA to establish policies and procedures for collecting and monitoring information about its customers, including Wright Bros., to ensure they "are not bad actors." ¶¶45-48. Trust accounts

usually require enhanced due diligence, such as having an automated account monitoring system that examines transactions to identify common characteristics of transactions related to a Ponzi scheme. ¶¶49-51. BOA also has anti-money laundering systems to identify suspicious activities. ¶52. "The information in this system disclosed that the Wright Brothers' transactions were not consistent with the nature of the [Trust] Account." *Id.*

## III.   PROPOSED CAUSES OF ACTION

### A. *Fraudulent Misrepresentation (First Cause of Action)*

A fraudulent misrepresentation claim under Florida law has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *In re Harris*, 3 F.4th 1339, 1349 (11th Cir. 2021) (quoting *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010)). "[T]he scienter element of fraudulent misrepresentation can be established in a number of ways, and not all of them involve knowledge of falsity: 'The knowledge, by the maker of the representation, of its falsity, ... can be established by either one of the three following phases of proof: (1) [t]hat the representation was made with actual knowledge of its falsity; (2) without knowledge either of its truth or falsity; [or] (3) under circumstances in which the person making it ought to have known, if he did not know, of its falsity.'" *Harris*, 3 F.4th at 1349 (quoting *Joiner v. McCullers*, 158 Fla. 562 (1947)).

A cause of action for fraud by omission requires proof that the defendant had a legal duty to disclose the omitted information:

> Fraud based upon a failure to disclose material information exists only when there is a duty to make such a disclosure." *Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. 4th DCA 2003). "This duty arises when one party has information which the other party has a right to know because there is a fiduciary or other relation of trust or confidence between the two parties." *Id.*

*Garofalo v. Proskauer Rose LLP*, 253 So. 3d 2, 7 (Fla. Dist. Ct. App. 2018).

### B. *Aiding and Abetting (Second, Third, and Fourth Causes of Action)*

The Proposed Amended Complaint includes three claims based on aiding and abetting theories: (1) aiding and abetting fraud, (2) aiding and abetting a breach of fiduciary duty, and (3) aiding and abetting conversion.

Tort claims based on a theory of aiding and abetting have three elements: (1) the existence of an underlying violation; (2) knowledge of the violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the violation by the alleged aider and abettor. *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012); *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097–98 (11th Cir. 2017) (citing *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 72 (Fla. Dist. Ct. App. 2005)). Where a bank is alleged to have aided and abetted a customer in committing a tort, there must be proof that the bank had actual knowledge of the wrongdoing. *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) (citations omitted).

Actual knowledge can be shown through willful blindness because knowledge is imputed "when a person has his or her suspicion aroused about a particular fact,

realized its probability, but deliberately refrained from obtaining confirmation because he or she wanted to remain in ignorance." Florida Pattern Jury Instruction (Criminal) 3.3(h).

"While the element of actual knowledge may be alleged generally, the plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud." *Todd Benjamin Int'l, Ltd. v. Grant Thornton Int'l, Ltd.*, No. 20-21808-CIV, 2023 WL 4457458, *15 (S.D. Fla. July 11, 2023) (*quoting Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012), *aff'd sub nom. Lamm v. State St. Bank & Tr.*, 749 F.3d 938 (11th Cir. 2014)). "Conclusory statements that a defendant 'actually knew' [are] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest that the defendant 'should have known that something was amiss.'" *Id.* (quoting *Platinum Estates, Inc. v. TD Bank, N.A.*, No. 11–60670–CIV, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012)).

Aiding and abetting can be shown through circumstantial evidence. The degree of knowledge that can be inferred "depend[s] on how ordinary the assisting activity is in the business involved." *Perlman v. Bank of Am., N.A.*, No. 11-80331-CV, 2011 WL 13108060, at *6 (S.D. Fla. Dec. 22, 2011). "[S]tronger evidence of complicity" is required "for the alleged aider and abettor who conducts what appears to be a transaction in the ordinary course of his business," whereas conduct that is atypical or lacks business justification may allow for an inference of knowledge. *Id.* (quoting *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009-10 (11th Cir. 1985)).

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Chang*, 845 F.3d at 1098 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)). "Because 'banks do have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled,' a bank's inaction—that is, its failure to stop the theft of such trust funds—can constitute substantial assistance." *Id.; Groom v. Bank of Am.*, No. 8:08-CV-2S67-JDW-EAJ, 2012 WL 50250, at *4 (M.D. Fla. Jan. 9, 2012) ("[F]ailure to act, absent a duty to act, is not substantial assistance.") (citation omitted). "[T]o establish that a bank substantially assisted a fraudulent scheme to steal trust funds, knowledge of the underlying fraud "is the crucial element." *Chang*, 845 F.3d at 1098 (quoting *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006)).

*C. Negligence (Seventh Cause of Action)*

Under Florida law, "[t]o maintain an action for negligence, a plaintiff must establish that the defendant owed a duty, that the defendant breached that duty, and that this breach caused the plaintiff damages." *Chang*, 845 F.3d at 1094 (quoting *Fla. Dep't of Corr. v. Abril*, 969 So. 2d 201, 204 (Fla. 2007)).

IV.    ARTICLE III STANDING

All Plaintiffs except Moncler Motors, LLC, have adequately pled Article III standing. The Proposed Amended Complaint pleads that all Plaintiffs except Moncler Motors, LLC, deposited money into the Trust Account and lost that money. These allegations plausibly allege an injury-in-fact. The Proposed Amended Complaint also

20

alleges that all Plaintiffs had either received copies of one or more Letters before investing, or had been told about the content of the Letters before investing, and that they relied on these Letters in deciding to deposit money into the Trust Account. These allegations, accepted as true at this stage, are sufficient to plead traceability.

Because Moncler Motors LLC did not lose any money in the fraud scheme, it has not suffered a sufficient injury-in-fact.

## V. DISCUSSION

BOA says granting leave to amend would be futile because the Proposed Amended Complaint still fails to allege that (1) BOA actually knew of, or was willfully blind to, Wright Bros.' illegal scheme, (2) BOA had a duty to the Plaintiffs, (3) BOA specifically intended for the Plaintiffs to rely on the Letters, and (4) Plaintiffs could reasonably rely on letters issued years before they invested. ECF No. 52 at 14–17.

Viewed in light most favorable to Plaintiffs, the Proposed Amended Complaint plausibly alleges that (1) the Trust Account held escrow funds, (2) therefore, when Plaintiffs deposited their money into that account, a fiduciary relationship existed between Wright Bros. and Plaintiffs, (3) BOA knew that the Trust Account held escrow funds, (4) BOA knew a fiduciary relationship existed between Plaintiffs and Wright Bros. because the Trust Account held escrow funds, (5) BOA knew that third parties (not necessarily these Plaintiffs) would be shown the Letters and would rely on them, and (6) BOA was aware of irregular transactions in the Trust Account.

Plaintiffs' claim for fraudulent misrepresentation fails because the Proposed Amended Complaint does not plausibly allege that BOA knowingly made false

representations to the Plaintiffs. The aiding and abetting causes of action fail because the Proposed Amended Complaint does not allege facts entitled to the assumption of truth that plausibly imply that BOA knew that Wright Bros. was committing the underlying torts. It also fails to plausibly allege that BOA substantially assisted in Wright Bros. wrongful conduct. Finally, the common-law negligence claim fails because the Proposed Amended Complaint fails to plausibly allege that BOA owed a duty to Plaintiffs.

### A. *Actual Knowledge*

1. <u>Account Transactions</u>

The Proposed Amended Complaint alleges (1) monies were transferred in and out of the Trust Account on the same day they were deposited, (2) funds were released to third parties, in violation of the Escrow Agreements and customary aviation transaction practices, and (3) "funds were being disbursed in amounts different from the deposits." ¶100. The Proposed Amended Complaint does not identify any particular problematic transaction, including whether it occurred before or after BOA issued the Letters. Nevertheless, Plaintiffs say these facts plausibly allege that BOA knew that the activity in the Trust Account was not consistent with an account holding escrow funds for an aviation transaction. *See, e.g.,* ¶26 (disbursing escrow funds only to the original depositor "is customary in aircraft transactions.");[5] ¶97

---

[5] Paragraph 26 of the Proposed Amended Complaint alleges, "Wright Brothers also agreed to, 'under no circumstances . . . disburse the Escrow Funds or any portion thereof to any party other than the Depositor,' as is customary in aircraft transactions." ¶26. In this Court's experience, for high-dollar commercial transactions like buying or selling an aircraft, it is common for the funding to be sent

(BOA had knowledge of the unusual activity and large withdrawals from the Trust Account and knew that that activity was not consistent with a trust account holding escrow funds, particularly given its knowledge of the Escrow Agreements Wright Brothers entered into with Plaintiffs"); ¶99 (BOA "knew that the withdrawals from the Trust Account were not consistent with the nature of escrowed deposit funds in the aviation industry.").

The Proposed Amended Complaint alleges that BOA was familiar with the aviation industry and knew how aviation escrow accounts were handled. So, if aviation transactions do not allow escrow funds to be disbursed to third parties, and BOA knew that Plaintiffs' funds were being transferred to third parties, then BOA was on notice that something was amiss with how Wright Bros. was handling funds in the Trust Account. The Proposed Amended Complaint says BOA knew funds were being transferred to third parties because BOA had to review the activity in the Trust Account before it issued the Letters. Those reviews occurred intermittently between August 2015 and August 2019. Viewing all these allegations in the light most favorable to Plaintiffs, the Proposed Amended Complaint plausibly alleges that BOA knew that irregular transactions were happening in the Trust Account.

---

to a closing agent (or title agent, or escrow agent) at the last minute and then to be almost immediately disbursed to the seller and to third parties who are owed money relating to the transaction (e.g., lienholders, attorneys, investment bankers, insurers, etc.). These individual disbursements will be for different amounts than the funding deposit. Nevertheless, for purposes of the pending Motion, the Court accepts the allegations in Paragraph 26 as true.

Nevertheless, the fact that BOA knew about irregular transactions does not plausibly allege that BOA had actual knowledge that Wright Bros. was misappropriating funds. "Florida does not require banking institutions that conduct routine banking services to investigate transactions involving its demand deposit accounts." *Perlman,* 559 F. App'x at 993. "Red flags" in banking transactions alone "d[o] not constitute the conscious awareness of wrongdoing necessary to maintain an aiding and abetting cause of action." *Groom*, 2012 WL 50250, at *3 (quoting *Lawrence v. Bank of America, N.A.*, No. 8:09–cv–2162–T–33TGW, 2010 WL 3467501, at *3 (M.D. Fla. Aug. 30, 2010)). *See also Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1245 (M.D. Fla. 2013) (while red flags "may have put the banks on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge of wrongdoing . . . [and] banks that conduct routine banking services, even for transactions or activities that appear atypical upon review, are not required to investigate the account holder's transactions") (internal citations and quotations omitted). "[M]erely alleging that a bank should have known of a Ponzi scheme based solely on a series of purportedly atypical transactions is not sufficient [to plead knowledge]." *Perlman* 559 F. App'x at 993 (citations omitted).

Additionally, the fact that Plaintiffs signed Escrow Agreements with Wright Bros. is not circumstantial evidence that BOA actually knew Wright Bros. was misappropriating Plaintiffs' deposits. The sole factual allegation in the Proposed Amended Complaint that BOA knew about the Escrow Agreements is, "BofA also received at least one Escrow Agreement. The Escrow Agreement made clear that the

24

funds deposited into the Trust Account were deposits to be held in escrow by Wright Brothers and that the funds could not be disbursed to any party other than the depositor Plaintiff." ¶43(d). The Proposed Amended Complaint does not allege facts showing when BOA received this Agreement, which Plaintiff was a party to it, who at BOA received it, or other details necessary to plausibly imply that BOA knew Wright Bros. was violating the Escrow Agreement for any particular Plaintiff. The fact that, at some point, BOA received one Escrow Agreement does not imply that BOA knew that similar Escrow Agreements applied to all funds deposited into the Trust Account by all Plaintiff-depositors.[6]

The account activity does not plausibly imply BOA's actual knowledge.

2.  <u>Allegedly False Letters</u>

Plaintiffs next say that BOA's actual knowledge can be inferred because the Letters made affirmative false statements and material omissions. For affirmative false statements, Plaintiffs allege:

> The Letters included general and specific representations about the legitimacy, stability, and creditworthiness of Wright Brothers, describing BofA's 'strong banking relationship' with Wright Brothers, identifying Wright Brothers' status as 'in excellent standing,' stating that BofA 'had never received a complaint having to do with the services [Wright Brothers] provide to their clients,' and providing account information concerning aviation transactions.

¶77 (bracket in original). Plaintiffs have not plausibly pled (1) that these statements were false or (2) if they were false, BOA knew it.

---

[6] Additionally, to the extent Plaintiffs rely on Paragraph 43(d) as evidence of knowledge of the fraud, it lacks the specificity that Fed. R. Civ. P. 9(b) requires.

The Proposed Amended Complaint does not allege facts that dispute (1) Wright Bros. had maintained a banking relationship with BOA since approximately 2002, (2) at the time the letters were written, Wright Bros. accounts were in good standing,[7] (3) BOA had never received a complaint about Wright Bros., and (4) the Letters accurately reflected the flow of funds through the Trust Account. In fact, Plaintiffs concede that some of the account balances in the Letters were accurate. ¶¶60–65.

The remaining allegedly false statements are that (1) Wright Bros. was a respected aviation company, (2) the funds flowing through the Trust Account were all aviation transactions, and (3) the Trust Account was an escrow account.

Plaintiffs do not plead facts showing that, before the Ponzi scheme became public, Wright Bros. was not a well-respected aviation title company. Nor do they plead facts showing that BOA did not believe Wright Bros. to be a well-respected aviation title company when it issued the Letters. After all, Wright Bros. had maintained the Trust Account at BOA for almost two decades without a complaint. The Proposed Amended Complaint alleges only one fact that would have made the statement in the Letters about Wright Bros.' reputation false — BOA had actual knowledge that Wright Bros. was committing a crime. Plaintiffs' argument is circular. It goes: (1) BOA's actual knowledge of Wright Bros. criminal conduct can be inferred from the fact that (2) BOA falsely represented in the Letters that Wright Bros. was a

---

[7] The Proposed Amended Complaint does not explain why the accounts were not "in good standing." For example, there is no allegation that the accounts had been overdrawn, that account-related fees had not been paid, etc.

well-respected aviation title company, (3) which BOA knew was a false representation (4) because BOA had actual knowledge of Wright Bros. criminal conduct.

Because of the allegations in Paragraph 26, the Proposed Amended Complaint plausibly alleges that BOA knew non-aviation transactions were occurring in the Trust Account. The Proposed Amended Complaint argues that because BOA knew that some of the Trust Account transactions were not legitimate aviation transactions the Letters inaccurately stated the amount of Wright Bros.' aviation transactions. Careful analysis shows that, at best, only one Letter misrepresented the dollar amount of aviation transactions; this Letter was received by only one set of Plaintiffs.

The first two Letters are from August and December 2015. They say, "Wright Brothers Aviation Title has authorized [BOA to say that a certain amount of] "aviation transactions have passed through their accounts in the past 6 months." Because the Proposed Amended Complaint does not exclude the possibility that Wright Bros. crimes began in 2016, it does not plausibly allege that these Letters were false.

The next two Letters discuss the "aggregate average collected deposit balance" in the Trust Account. Plaintiffs concede that the listed amounts are accurate. This Letter does not represent that all the deposits were for aviation transactions. The next Letter also merely states the amount of deposits into the Trust Account, without representing whether they were for aviation transactions. The Proposed Amended Complaint fails to plausibly allege that any of these Letters were false.

The next Letter says, "Wright Brothers Aviation Title has authorized me to tell you that their average volume over the last 6 months has been $183MM." It does not clearly define what is being averaged and does not reference aviation transactions.

The next Letter, dated January 24, 2019, says, "Wright Brothers Aviation Title has authorized me to tell you that over $257 MM dollars in aviation transactions have passed through their account in the past 6 months, annualizing at over $515 MM."

The last two Letters discuss Wright Bros.' "aggregate average collected balance" over the previous six months. Once again, there is no representation that this number includes only "aviation transactions."

Even viewing the Letters in the light most favorable to Plaintiffs, only the January 24, 2019, Letter could have misrepresented the legitimate amount of aviation transactions. But, the Proposed Amended Complaint does not specifically allege that any non-aviation transactions occurred in the six months before January 24, 2019. So, standing alone, this Letter does not imply BOA had actual knowledge that Wright Bros. was operating a Ponzi scheme.

3. <u>Escrow Account</u>

In its Reply and at oral argument, Plaintiffs said BOA misrepresented that it was treating the Trust Account as an escrow account even though internally it had designated the account as a demand deposit account. ECF No. 53 at 9. Notably, only one Letter references an escrow account — the April 27, 2017, letter. The Proposed Amended Complaint pleads that the CMG Plaintiffs received that Letter; it does not plausibly allege that any other Plaintiff saw it. The other Letters speak only of Wright

Bros.' "accounts." And, the Proposed Amended Complaint does not plead that Plaintiffs ever saw BOA documents (including account statements) that referred to the Trust Account as an escrow account, or (if they did) that BOA knew Plaintiffs had seen these documents.

Aside from the CMG Plaintiffs seeing the April 2017 Letter, the Proposed Amended Complaint pleads that in 2016 and 2018 or 2019, the CMG Plaintiffs told BOA officials that they were considering doing transactions with Wright Bros. in which funds would be held in escrow. ¶82(a). It further pleads that the Moncler Plaintiffs had a similar conversation with BOA in 2016. ¶82(c). Viewed in the light most favorable to Plaintiffs, BOA's silence in response to these statements was an acknowledgment that BOA knew these Plaintiffs expected Wright Bros. to treat the Trust Account as an escrow account. But, BOA's silence does not plausibly imply that BOA was taking on a fiduciary relationship with the CMG Plaintiffs or the Moncler Plaintiffs.

I reject Plaintiffs' argument that there is a negative inference to be drawn from the fact that BOA knew Wright Bros. was representing that the Trust Account was an escrow account, but BOA did not treat it as one, internally. Whether BOA internally considered the Trust Account to be an escrow account does not matter. Even viewing the evidence in the light most favorable to Plaintiffs, BOA never told Plaintiffs that it was acting as an escrow agent or was otherwise taking on any fiduciary oversight duties with respect to the Trust Account.

As BOA persuasively explained at oral argument, it provides demand deposit banking services to customers. Some customers create escrow accounts that are governed by agreements between the bank's customer and third parties (here, the Plaintiffs). In those situations, BOA merely processes transactions as requested by its customer (that is, it treats the account like any demand deposit account). BOA does not assume any duty to the third party to act as an escrow agent or to police compliance with the escrow agreement. Of course, the situation would be different if BOA entered into an escrow agreement directly with the third parties.

4. <u>Non-Compliance with Letters Policy</u>

Plaintiffs say that BOA failed to follow its own policies on issuing reference letters, so there is an inference that BOA "was aware that the Letters were requested in connection with wrongful activity with respect to the Account." ¶100. Viewing the evidence in the light most favorable to Plaintiffs, BOA knew of the account activity because the Letters Policy required it to review that activity before issuing each Letter. But, the ways in which BOA violated the Letters Policy do not plausibly imply that BOA knew Wright Bros. was stealing Plaintiffs' money.

The Proposed Amended Complaint does not say specifically which provisions of the Letters Policy were violated. ¶¶87-96. Viewed in the light most favorable to Plaintiffs, it appears the alleged violations were:

- The letters were not limited to objective facts in that they opined that Wright Bros. was a well-respect aviation title company.

- Some were addressed "To Whom It May Concern."

- The Letters were not "related to an identifiable purpose, project/contract, or [] trade related."

- The Letters were not signed by a senior enough bank official.

From these facts, Plaintiffs conclude, "[T]he contents and issuance of the Letters violated the Letters Policy, which shows BofA was aware that the Letters were requested in connection with wrongful activity with respect to the [Trust] Account." ¶95. Plaintiffs say that BOA's knowledge of the fraud can be inferred from the fact that BOA violated its own Letters Policy, which meant the Letters were not transactions in the ordinary course of BOA's business and constituted conduct that was atypical or lacked business justification. ¶96.

Even viewed in the light most favorable to Plaintiffs, these violations of the Letters Policy do not circumstantially imply that BOA knew Wright Bros. was committing a fraud and/or that BOA substantially assisted it. As discussed above, the Proposed Amended Complaint does not plausibly negate that BOA had a good faith belief that Wright Bros. was a legitimate, well-respected company. Similarly, Plaintiffs have not shown that addressing a letter "To Whom It May Concern," or having a lower-level bank officer sign the Letter, implies nefarious intent or knowledge. These facts are readily distinguishable from other cases where knowledge was inferred. *See Perlman*, 2011 WL 13108060, at *7 (bank opened multiple investment club accounts for its fraudster-customer in violation of its own policy); *Smith v. First Union National Bank*, No. 1:00–cv–04485, 2002 WL 31056104 at *4

(S.D. Fla. Aug. 23, 2002) (bank employee admitted that she "did some transferring I shouldn't have done.").

### 5. Fraud by Omission

Plaintiffs say the Letters "were misleading because they failed to disclose facts necessary to make them complete and accurate" ¶83. The alleged missing facts were: (1) the amount and timing of funds withdrawn from the Account, (2) that funds passing through the account were not all for aviation transactions, (3) the Letters did not disclose that the "volume" of transactions were not limited to aviation transactions, (4) BOA did not disclose that the "average volume" listed in the Letters actually reflected the total volume of transactions, and (5) BOA used a different methodology to calculate "average collected balance" in 2019 than it did in 2017. *Id.*

The Proposed Amended Complaint does not plausibly plead fraud by omission. First, it fails to allege that BOA owed Plaintiffs a duty of disclosure. Plaintiffs were not BOA's customers. "[A]s a general matter, 'a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship.'" *Chang*, 845 F.3d at 1094 (citation omitted). The timing of the Letters, the Escrow Agreements, and the deposits reinforces that BOA owed no duty to the Plaintiffs when it issued the Letters.

The first Letter was issued in August 2015; the Proposed Amended Complaint does not plausibly allege that the Ponzi scheme had started then. ¶35 (scheme began "no later than 2016"). The last Letter was issued in August 2019. The first Escrow Agreements were signed in November 2019 and the first deposits were made that

month. So, when BOA issued the Letters it could not have known about any fiduciary relationship between Plaintiffs and Wright Bros. because none existed.

Even when viewed in the light most favorable to Plaintiffs, the Proposed Amended Complaint does not plead that BOA owed a duty of disclosure to the Plaintiffs when it issued the letters. BOA did not know the CCUR/Edidin Plaintiffs, the Rusty Plaintiffs, or the Bayside Plaintiffs existed when it issued the Letters, so it did not owe them any duty of disclosure. The Proposed Amended Complaint says the CMG Plaintiffs spoke to BOA officers in 2016 and "in 2018 or 2019," and that Moncler Plaintiffs spoke to a BOA officer in 2016. ¶¶82(a), 82(c). It does not plead that BOA knew the other Plaintiffs existed when it issued the Letters. Nor does it plead that BOA later learned that they existed prior to the filing of this lawsuit.[8] Similarly, the mere fact that the CMG Plaintiffs and the Moncler Plaintiffs spoke to BOA officials does not give rise to a duty of disclosure.

Finally, the fact that BOA changed its methodology for computing average collected balance would be relevant only if a particular Plaintiff had seen Letters using both methodologies without being told that the methodology had changed. The Proposed Amended Complaint does not plausibly allege this scenario.

6. Willful Blindness

Plaintiffs say they have plausibly alleged willful blindness based on (1) BOA's familiarity with aviation transactions, (2) BOA's violation of its own Letter Policies,

---

[8] For example, although the Proposed Amended Complaint pleads that Plaintiffs made deposits into the Trust Account, it does not allege how those deposits were recorded and why BOA would have been on notice of the identity of the depositor.

(3) the representations in the Letters that Wright Bros. was conducting aviation transactions. ECF No. 48 at 6-7. From these facts, Plaintiffs say, "[T]he Court can draw the reasonable inference that BofA (1) knew what the typical logistics of an aviation transaction were; (2) had in its possession, and reviewed, sufficient Trust Account activity information to be aware there was highly suspicious activity (including millions of dollars being deposited and withdrawn on the same day) that was totally inconsistent with a legitimate aviation escrow transaction; and (3) had to studiously ignore that information to make the representations it did in the Letters." ECF No. 48 at 7.

For the reasons discussed above, the well-pled allegations do not plausibly imply that BOA (1) knew about activity in the Trust Account that put it on notice Wright Bros. was misappropriating funds, (2) had a duty to Plaintiffs to investigate further, or (3) took affirmative steps to remain ignorant.

### B. Negligence

Plaintiffs say they state a claim for negligence "because BofA had knowledge of Wright Brothers' fiduciary obligations to Plaintiffs, and because BofA had knowledge of the Trust Account's highly unusual and suspicious activities, BofA owed Plaintiffs a duty which its material misrepresentations and omissions in the Letters directly violated." ECF No. 48 at 7. "[A] bank may be liable to a noncustomer for its customer's misappropriation when a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary

relationship, and the bank has actual knowledge of its customer's misappropriation."
*Chang*, 845 F.3d at 1094-95.

As noted above, viewing the evidence in the light most favorable to Plaintiffs, BOA knew that Plaintiffs were in a fiduciary relationship with Wright Bros. But, for the reasons also discussed above, Plaintiffs have not plausibly alleged that BOA had actual knowledge of Wright Bros.' misappropriation.

*C. Procedural Objections*

Because I find on the merits that amendment would be futile, I need not resolve whether the Motion for Leave to Amend should be denied on procedural grounds under either Rule 16 or waiver principles.

## CONCLUSION

1. Based on the foregoing, Plaintiffs' Motion for Leave to Amend is DENIED.

2. All claims of Plaintiff Moncler Motors, LLC, are DISMISSED WITHOUT PREJUDICE for lack of Article III standing.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, this 15th day of April 2024.

_____
BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE

35